**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

ZI HE WU,

                                        Petitioner,

        v.                                                    9:19-CV-1284
                                                              (GLS/CFH)

LORRAINE JONES, Superintendent for Mid-State
Correctional Facility
                                        Respondent.
_____

**APPEARANCES:**                          **OF COUNSEL:**

STACEY A. VAN MALDEN
Attorney for Petitioner
Office of Stacey Van Malden
5114 Post Road
Bronx, New York 10471

HON. LETITIA JAMES                        PRISCILLA I. STEWARD, ESQ.
Attorney for Respondent                   Ass't Attorney General
New York State Attorney General
The Capitol
Albany, New York 12224

**CHRISTIAN F. HUMMEL**
**United States Magistrate Judge**

**REPORT-RECOMMENDATION and ORDER**

## I.    INTRODUCTION

        Petitioner Zi He Wu ("Petitioner") seeks federal habeas corpus relief pursuant to

28 U.S.C. § 2254.  Dkt. No. 1, Petition ("Pet.").  Respondent filed a response.  Dkt. No.

6, Response; Dkt. No. 6-1, Memorandum of Law in Opposition to Petition for Writ of

Habeas Corpus; Dkt. No. 7, State Court Records ("SR"); Dkt. No. 7-1, State Court

Transcripts ("T.").

1

## II.    RELEVANT BACKGROUND

### A. Charged Offenses

In an indictment dated June 9, 2016, a Grand Jury charged Petitioner with two counts of Assault in the Second Degree in violation of New York Penal Law § 120.05(2) (hereinafter, "N.Y.P.L.") and one count of Criminal Mischief in the Fourth Degree in violation of N.Y.P.L. § 145.00(3).[1]  *See* SR 24-25, Indictment.[2]  The Grand Jury found that "on or about April 21, 2016," Petitioner: (1) "with intent to cause physical injury to another person . . . caused such injury to such person or to a third person by means of a dangerous instrument, said person being Vonny Surjoto-Lawrence[;]" (2) "with intent to cause physical injury to another person . . . caused such injury to such person or to a third person by means of a dangerous instrument, said person being Paula Gonzales[;]" and (3) "having no right to do so nor any reasonable ground to believe that he had such right, did recklessly damage property of another person in an amount exceeding $250.00." SR 24-25.  Petitioner entered a plea of not guilty to all three counts. *See* Pet. at 5.

Petitioner's counsel submitted an Omnibus Motion on Petitioner's behalf dated July 28, 2016.  *See* SR 27-40, Petitioner's Omnibus Motion.  Petitioner sought to dismiss the indictment or, alternatively, to transcribe and inspect the grand jury minutes, release the grand jury minutes; suppress physical evidence allegedly seized in violation of Petitioner's Fourth and Fourteenth Amendment rights; and suppress statements Petitioner allegedly involuntarily made to officers of the Montgomery County Sheriff's

---

[1] The count of Criminal Mischief in the Fourth Degree was dismissed by consent at the start of Petitioner's trial.  T. 200.
[2] All citations to the parties' submissions will refer to the pagination generated by CM/ECF, the Court's electronic filing system.

Office.  *See* SR 32-40.  The People submitted an answering affirmation.  *See* SR 41-42, People's Answering Affirmation.

On August 23, 2016, Montgomery County Court issued a Decision and Order holding "the evidence before the grand jury [was] sufficient to establish the offenses charged."  SR 47.  County Court further: denied Petitioner's motion to release minutes of the grand jury proceedings; held the grand jury proceedings substantially conformed with the requirements of New York Criminal Procedure Law Articles 190 and 200 (hereinafter, "C.P.L."); directed the People to furnish to Petitioner all *Brady* material; denied Petitioner's motion for a pre-trial *Huntley* hearing;[3] decided a *Sandoval* hearing would be held immediately prior to trial;[4] decided a *Ventimiglia* hearing would be held immediately prior to trial and directed the People to seek an advance ruling on the use of any *Molineux* evidence at such hearing;[5] and denied Petitioner's motion to suppress physical evidence allegedly seized from him without prejudice.[6]  *See* SR 47-51, County Court Decision & Order.

**B.  Jury Trial**

---

[3] *See generally People v. Huntley*, 15 N.Y.2d 72 (1965).  Specifically, County Court denied Petitioner's motion "based upon the People's Answering Affirmation, paragraph (12)."  SR 48.  Said paragraph states "[t]he People do not intend to offer any statements made by [Petitioner] other than those made by [Petitioner] during the course of the criminal transaction."  SR 42.

[4] *See generally People v. Sandoval*, 34 N.Y.2d 371 (1974).

[5] *See generally People v. Ventimiglia*, 52 N.Y.2d 350 (1981), *People v. Molineux*, 168 N.Y. 264 (1901).

[6] *See generally Mapp v. Ohio*, 367 US 643 (1961).  In his Omnibus Motion, Petitioner averred:

> [A]t St. Mary's Hospital, an officer of the Montgomery County Sheriff's Office searched [Petitioner's] front pant pocket whereupon the officer seized a plastic bag allegedly containing a white powdery substance identified by the officer as 'Crack Cocaine' . . . [however, Petitioner] did not consent to the officer's search . . . [and] had a reasonable expectation of privacy in the area that the officer had searched . . . .

SR 37.  In denying Petitioner's subsequent motion to conduct a *Mapp* hearing, County Court reasoned that Petitioner "is not charged with possessing crack cocaine and the grand jury minutes are devoid of any mention of crack cocaine."  SR 50.

Petitioner appeared before County Court for a jury trial on September 21, 2016. *See* T. 1-193.  County Court began the proceedings by having the Official Court Interpreter, Wunder Lui, sworn in.  T. 5-6.  As discussed in greater detail below, County Court first heard arguments on Petitioner's notice of intent to present evidence of a mental disease or defect pursuant to C.P.L. § 250.10.  T. 6-15.

County Court next explained Petitioner's *Antommarchi* rights,[7] and Petitioner waived his right to be present at the bench.  T. 15-17.  The parties provided witness information, and the People finished turning over *Rosario* material.  T. 19-22.  A jury panel was seated, and the jury selection process began and continued following the lunch recess.  T. 23-169.  The jury was sworn in and subsequently excused for the day. T. 169-76.  County Court continued hearing arguments about Petitioner's use of the affirmative defense and decided to reserve its ruling until the following morning.  *See* T. 177-90.

On September 22, 2016, trial proceedings resumed and County Court first granted Petitioner's motion to proceed with psychiatric evidence, and the People declined an adjournment to have Petitioner examined.  T. 197-98.  The People next moved to dismiss count three of the indictment, criminal mischief in the fourth degree. T. 199-200.  Petitioner consented to dismissal, and the charge was dismissed. T. 200. The jury was seated and instructed.  T. 201-26.  The People made an opening statement, *see* T. 226-34, and Petitioner's counsel followed, *see* T. 234-38.

### 1.  The People's Case

#### i.    Vonny Surjoto-Lawrence

---

[7] *See generally*, *People v. Antommarchi*, 80 N.Y.2d 247, 249-50 (N.Y. 1992).

The People called Vonny Surjoto-Lawrence as their first witness.  T. 238-97.  Ms. Surjoto-Lawrence testified that in April of 2016, she worked full-time as a charge nurse in the in-patient mental health unit at St. Mary's Hospital.  T. 239-40.  The witness stated that on April 19, 2016, while she was working the night shift, she completed an admission for a person who she identified as Petitioner.  T. 241-42.  Ms. Surjoto-Lawrence testified that Petitioner was "alert and oriented" and "calm and cooperative." T. 242.  The witness stated it was reported that Petitioner carried cash and cocaine, and Petitioner admitted to possessing cocaine.  T. 243.  Ms. Surjoto-Lawrence explained that Petitioner was admitted to the mental health unit, and repeatedly asked to go home. T. 244.

Ms. Surjoto-Lawrence testified that the following day, April 21, 2016, she worked her next night shift with Paula Gonzales and John Spratt.  T. 245-46.  She stated that around midnight, she observed Petitioner "peeking [out] from his door[.]"  T. 246-47. Ms. Surjoto-Lawrence testified that around 3:45 AM, Petitioner approached the nurses station window and asked to use the phone to call his wife but was told he could not until later in the morning.  T. 249-50.  Ms. Surjoto-Lawrence stated that while Paula was in the bathroom and John was on break, she saw Petitioner pick up a hard plastic bed alarm, remove the battery, and place the device in his pocket.  T. 250-51.

Ms. Surjoto-Lawrence explained that Paula returned to the nurses' station, but later decided to exit again, and when Paula attempted to open the door from the inside, Petitioner pushed the door from the opposite side and jumped on top of Paula.  T. 252. She testified that Petitioner attacked Paula, hitting her with a vital sign machine.  T. 252-53.  Ms. Surjoto-Lawrence attempted to call her supervisor, Carrie Francisco, but was

hit from behind so hard that she dropped her phone.  T. 253-54.  Ms. Surjoto-Lawrence testified Petitioner continued hitting her in the forehead, causing blood to burst from her head.  T. 254.  The witness recalled calling out for help, then going to the medication room located next door to dial the hospital emergency number.  T. 255-56.

Ms. Surjoto-Lawrence testified that before she could explain the emergency on the phone, she was hit again and could not escape the medication room because Petitioner stood between the witness and the only door.  T. 257.  The witness stated that once Petitioner left the doorway, she was able to exit to the hallway where she informed her supervisor that she needed to go to the emergency room.  T. 258.  Ms. Surjoto-Lawrence stated when she inserted her key into the door to exit the unit, Petitioner attacked her again, beating her in the back and poking her in the eyes with a pen.  T. 259.

Ms. Surjoto-Lawrence was eventually escorted out of the unit by security and taken to the emergency room where she was treated for a concussion, hematoma, abrasions, and a broken nose.  T. 263-66.  She testified that, at the time of the trial, she was still in pain, despite receiving treatment from a variety of specialists, and had vision problems.  T. 290-93.

Petitioner's counsel cross-examined the witness.  T. 297-326.  Ms. Surjoto-Lawrence explained Petitioner had been involuntarily admitted to the hospital, and was not permitted to leave without a doctor's authorization.  T. 305-08.  She also reported that Petitioner repeatedly asked to leave.  T. 309.  Ms. Surjoto-Lawrence explained that Petitioner's drug screen test results were negative, revealing no presence of cocaine, marijuana, or other drugs.  T. 309.

6

The People conducted a re-direct examination.  T. 326-31.  The Assistant District Attorney ("A.D.A.") asked whether Ms. Surjoto-Lawrence, "at any point, observe[d] the [Petitioner] to behave in a psychotic manner while [Ms. Surjoto-Lawrence] w[as] supervising him as [her] patient," and the witness answered "[n]o. [Petitioner] was not psychotic at all."  T. 331.  Defense counsel briefly re-cross examined Ms. Surjoto-Lawrence.  T. 331-32.

### ii.  Carrie Wood Francisco

Next, the People called Carrie Wood Francisco.  T. 332-47.  Ms. Wood Francisco stated that in April 2016, she worked as a nursing supervisor at St. Mary's Hospital and was responsible for supervising multiple units during the night shift, including the mental health unit.  T. 334-35.  Ms. Wood Francisco recounted receiving a phone call around 3:45 AM on April 21, 2016, hearing only people yelling in the background, after which she immediately ran to the third floor.  T. 336.  Ms. Wood Francisco further stated that she walked down the corridor to the nurses' station where she saw a person, who she identified as Petitioner, accosting the female psychiatric assistant and nurse.  T. 337-38.

Ms. Wood Francisco testified Petitioner hit the nurse and psychiatric assistant with an IV pole and Ms. Vonny Surjoto-Lawrence was bleeding profusely and screaming.  T. 339-41.  Ms. Wood Francisco explained that she grabbed a cup of coffee from a nearby shelf and threw it at Petitioner, who then turned around and grabbed a set of keys which would have allowed him to exit the unit.  T. 341-42.  Next, the witness explained Petitioner exited the nurses' station and headed to the exit located at the south end of the unit, but Ms. Surjoto-Lawrence also tried to exit through the same door, leading Petitioner to accost her again, kicking and punching her.  T. 344-45.  Ms. Wood

Francisco testified that help eventually arrived, Petitioner was restrained on the floor, and Ms. Surjoto-Lawrence was taken to the emergency room.  T. 346-47.

Defense counsel cross-examined the witness.  T. 348-51.  Ms. Wood Francisco clarified that when Petitioner was attempting to exit the unit through the south entrance door, he did not start to assault Vonny Surjoto-Lawrence again until she reached the door where Petitioner fumbled with the keys.  T. 350.  The People subsequently conducted a re-direct examination.  T. 351-52.

### iii.    Paula Gonzales Putnam

The People next called Paula Gonzales Putnam to testify.  T. 352-87.  Ms. Gonzales Putnam stated she had worked as a psychiatric assistant in the mental health unit at St. Mary's Hospital for fifteen years. T. 353.  She testified that on the overnight shift from April 19 to April 20, 2016, she worked with registered nurse Vonny Surjoto-Lawrence and psychiatric assistant John Spratt.  T. 353-54.  Ms. Gonzales Putnam testified that at about 3:30 AM, a patient – who she identified as Petitioner – came to the nurses' station asking to use the phone, but she explained he could not at that time.  T. 358-59.

Ms. Gonzales Putnam stated that Petitioner later returned to the nurses' station and grabbed a bed alarm through a window.  T. 360.  She recalled that Petitioner attempted to remove a nine volt battery from the alarm, and when she opened the door to exit the nurses' station, Petitioner pulled the door open and forced himself in.  T. 361-62.  Ms. Gonzales Putnam testified Petitioner pushed her backwards into the door and punched her in the face.  T. 362.  She recalled Petitioner began hitting Ms. Surjoto-Lawrence on the face with the bed alarm and her unsuccessful attempt to stop

Petitioner by grabbing his arm.  T. 363.  She stated that Ms. Surjoto-Lawrence attempted to call for help, but Petitioner grabbed the phone and started hitting her with it.  T. 363-64.

Ms. Gonzales Putnam testified that Petitioner grabbed a blood pressure machine which separated from the pole when he started hitting her in the back of the head and neck with it.  T. 364-66.  The witness recalled seeing Ms. Surjoto-Lawrence "running around the unit[,] bleeding profusely, [and screaming] 'Help me. Help me. Help me.'"  T. 366.  Ms. Gonzales Putnam explained that Ms. Surjoto-Lawrence eventually entered the medicine room, but Petitioner followed her in, and when she left the medicine room, Petitioner followed her.  T. 366-67.  Ms. Surjoto-Lawrence reported that Petitioner grabbed a set of keys and ran toward the unit's main door, but security arrived shortly thereafter.  T. 368-69.

Ms. Gonzales Putnam stated she later went to the emergency room to receive treatment for her injuries, which included a severe concussion.  T. 372-84.  She testified that she was still receiving treatment for her injuries at the time of trial, and had only recently returned to light duty work in medical records.  T. 383-86.

Defense counsel conducted a cross-examination.  T. 387-95.  Ms. Gonzales Putnam answered that Petitioner was quiet and pleasant when she was first introduced to him and did not observe any negative interactions between Petitioner and Ms.Surjoto-Lawrence until the incident.  T. 391.  The People completed a re-direct examination.  T. 396-97.

Following the People's re-direct examination, the jury was dismissed for the day, and the parties conferred with County Court.  T. 399.  The prosecutor proposed a

stipulation that the People had met their burden with regard to the physical injury element of the assault charges and defense counsel indicated that he would discuss the matter with Petitioner.  T. 400-01.  Following the discussion the matter was adjourned for the evening.  T. 403.

The following day, when asked about scheduling, the People explained that a subpoena had been issued to Dr. David Osuma for a rebuttal, but the A.D.A. may not to call him, depending on Dr. Jin's testimony.  T. 409.  The parties also clarified the terms of the stipulation.  T. 409-11.

### iv.    Carl Rivenburg

Following the discussion, the jury was seated and the People called Carl Rivenburg.  T. 412-26.  Mr. Rivenburg testified he works as a security officer for St. Mary's Hospital.  T. 413.  He explained that on April 21, 2016, he was working the overnight shift with his partner, William Wager.  T. 415.

The security officer testified that around 4:00 AM, he was on the first floor when he heard a "code 45" call over the intercom.  T. 417.  Mr. Rivenburg explained that he responded to the mental health unit within minutes, joined by psychiatric assistant John Spratt and boilerman Ben Mars.  T. 418.  Mr. Rivenburg testified that when he opened the door to the unit, he saw Vonny Surjoto-Lawrence running toward the door, chased by a patient he identified as Petitioner.  T. 419-20.

Mr. Rivenburg explained he stopped the attack by putting Petitioner down on the floor and securing his harms behind his back.  T. 421.  Mr. Rivenburg testified that Petitioner "was just struggling trying to get away . . . [and] told [them] to get the fuck off of him, and he wanted to call his wife, and that he couldn't breathe."  T. 422.

Defense counsel cross-examined the security officer.  T. 426-28.  Mr. Rivenburg testified that despite Petitioner's claim that he could not breathe, there was nobody on Petitioner's back preventing him from being able to breathe.  T. 427.  During a brief re-direct examination, Mr. Rivenburg testified that Petitioner never claimed he heard voices, was afraid of people, or saw anyone chasing him.  T. 428-29.

### v.    William Wager

Next, the People called William Wager to testify.  T. 429-38.  Mr. Wager stated that he worked as a security officer at St. Mary's and worked the third shift on April 21, 2016, with his partner Carl Rivenburg.  T. 430-31.  Wager testified that around 4:00 AM, he received a call on his radio from the mental health unit and responded in less than a minute.  T. 433-34.

Mr. Wager explained that he entered the unit through the south-end door and saw Vonny Surjoto-Lawrence coming down the hallway bloodied and screaming to be let out, but the door was locked.  T. 434.  The security officer recalled helping Ms. Surjoto-Lawrence to the nurses' station where other staff were located and helping Mr. Rivenburg and Mr. Mars restrain Petitioner.  T. 435.  Mr. Wager stated that Petitioner was struggling and "said that he couldn't fucking breathe."  T. 435-36.  Mr. Wager testified that nobody was restricting Petitioner's breathing and Petitioner asked to call his wife.  T. 436.

Mr. Wager recalled that after Petitioner was removed from the unit by police officers, Mr. Wagner returned to the unit and saw that blood was everywhere.  T. 437. Defense counsel cross-examined Mr. Wager.  T. 438-52.  Mr. Wagner reported that he

did not see Petitioner when he completed a round of the unit earlier in the morning around 1:30 AM. T. 448-49.

### vi.   Nicholas Vickers

Lastly, the People called Nicholas Vickers to the stand.  T. 452-59.  Mr. Vickers stated he worked for the City of Amsterdam Police Department and was working the night shift on the morning of April 21, 2016.  T. 453.  The police officer explained that around 4:00 AM, while on patrol, he received "a 911 hang up call to St. Mary's Hospital[,]" started responding toward the hospital, and then received another call from a hospital desk officer explaining there was a disturbance in the mental health unit.  T. 454.

Officer Vickers testified that when he arrived, hospital security staff had detained a male on the ground, who he identified as Petitioner.  T. 455.  He reported that Petitioner asked for water and repeatedly stated he could not breathe.  T. 457.  He explained that Petitioner was handcuffed and removed from the hospital.  T. 456-57.

Defense counsel subsequently cross-examined Officer Vickers.  T. 459-64.  The officer explained when Petitioner was processed at police headquarters, he had bruising on his wrists, a torn shirt, some blood on his eye, and his demeanor was calm.  T. 461. The People conducted a re-direct examination, T. 464-68, and Petitioner's attorney re-cross examined the witness, T. 469.

### vii.   Mid-Trial Conference

The jury was withdrawn and County Court reviewed the proposed stipulation with the parties.  T. 470-72.  County Court briefly discussed a proposed jury charge concerning testimony that Petitioner had spoken in English and Petitioner's use of an

interpreter. T. 475-76. The parties signed a copy of the stipulation. T. 476-77. When the jury returned, the stipulation was read aloud, and the People rested their case-in-chief. T. 478-79. The jury was then admonished and excused for the evening. T. 479-82.

County Court invited defense counsel to make motions and Petitioner's attorney moved to dismiss, arguing that the prosecution failed to prove every element of the crimes, specifically intent. T. 485-87. The parties presented arguments on the motion to dismiss, and County Court reserved on the motion. T. 485-90.

The parties returned to County Court the following day, and Petitioner's attorney confirmed the defense was ready to present their case. T. 497. Before the jury entered the courtroom, defense counsel offered an exhibit containing Petitioner's medical records from St. Mary's. T. 497. The People argued that the records could not be admitted without a qualifying witness, and County Court agreed. T. 497-98. Therefore, the records were not admitted, and the jury was brought in to hear the defense's case. T. 499.

### 2. Petitioner's Case

#### i. Petitioner Zi He Wu

The defense first called Petitioner to the stand, who testified with the assistance of the Official Court Interpreter. T. 499-551. Petitioner introduced himself to the jury. T. 500. Petitioner testified that on April 19, 2016, after an argument with this wife, he decided to go for a drive by himself, during which his car broke down on highway 90 near Ft. Plain. T. 501-02.

Petitioner explained that he decided to get help, so he walked up a hill and saw a house, where he asked the residents to call 911.  T. 502-03.  Petitioner stated he waited about ten to fifteen minutes in the road for the police to arrive, then asked the police to call a taxi for him.  T. 504.  Defense counsel asked why Petitioner did not ask the residents to call a taxi directly and Petitioner responded that he thought it would be easier to have the homeowners call 911.  T. 504.  Petitioner testified that he asked the police for help calling a taxi, but they did not help him, so he started walking toward another town.  T. 505-06.

Petitioner recalled asking various individuals for assistance, including the employees of a gas station, a pizza store, a Chinese restaurant, and another store.  T. 506-07.  Petitioner testified that he continued searching for someone willing to assist him and approached an intersection where a police car turned on it lights.  T. 508-09. The police officer told Petitioner he was disturbing people, and Petitioner asked why the officer would not help him.  T. 509.  Petitioner stated that the officer handcuffed him, put him in the police car, and drove to the police station.  T. 509-10.

At the police station, Petitioner was processed and called his wife.  T. 511-12. Petitioner testified he was taken to a courthouse, then was driven some distance by local police, until he was turned over to state police.  T. 512.  Petitioner stated he was taken to jail, but the jail rejected him, so Petitioner was taken to St. Mary's Hospital.  T. 513.  Petitioner testified that he asked why he was being taken to the hospital, and did not understand why he was being evaluated.  T. 514-15.  Petitioner recalled that the hospital administered several different tests then asked him to sign papers.  T. 517-18.

After he departed St. Mary's Hospital, Petitioner explained he was taken back to jail. T. 518. Petitioner testified he called his wife to bring one thousand dollars for bail. T. 518. Petitioner stated he was brought back to the hospital, but did not understand why. T. 518-20. Petitioner testified he did not like talking to the hospital's doctors. T. 520-21. He also explained he felt "ridiculous" and felt the whole situation was "unreasonable." T. 525.

Petitioner testified that he remained calm as three security guards escorted him to the third floor. T. 526. Petitioner testified that he slept at the hospital and woke up the following day experiencing pain in his feet, knees, and wrists. T. 530. Petitioner explained that he "fe[lt] kind of dizzy" and "the ground . . . [looked] like it [wa]s floating" because "the ground . . . [wa]s like moving . . . up and down." T. 530-31. Petitioner stated he saw "people coming out of the wall" and "heard people talking in [his] ears." T. 531.

Petitioner testified that there was another patient in the unit, around twenty-one years old, who was very "angry" and "unstable." T. 534. Petitioner stated the two of them went outside to a balcony where they meditated. T. 535. Petitioner testified he returned to his room until dinner, then watched TV in the lounge. T. 536.

After watching TV, Petitioner explained that the patients returned to their rooms, and then Petitioner heard screaming coming from a room that he watched a nurse enter. T. 538. Petitioner stated that he was scared by the screaming, which lasted about half an hour. T. 538-39. Petitioner became terrified and was concerned that if he went to sleep he could "be the next victim." T. 540. He reported that the nurse left the first room and went into another, after which Petitioner heard screams from the second

room.  T. 540.  Petitioner testified that he wanted to call his wife, but was not permitted.  T. 541.

Petitioner next explained he made an agreement with the younger man he had meditated with earlier where they would alternate sleeping and keeping watch every two hours.  T. 542.  Petitioner stated that he felt like he needed someone to watch over him because he was "afraid [he was going] to die there."  T. 542-43.  Petitioner testified that he stopped hearing the screaming noises, but the central air coming from the ceiling made him feel like he could not breathe.  T. 544.  Petitioner stated he informed the nurses many times that he wanted to call his wife, but they refused.  T. 545-46.  He later said he "fe[lt] like [he] was dying" because he "c[ouldn't] breathe."  T. 546-47.

Petitioner recalled thinking that he had to leave the hospital feeling that "if [he] stay[ed t]here [he would] die."  T. 547.  He said he knew the doors were locked so he would need a key.  T. 547.  Defense counsel asked if Petitioner remembered getting the keys, and Petitioner said he did not.  T. 548.  Counsel asked if Petitioner remembered hurting anyone, and Petitioner answered that he did not.  T. 548.  Petitioner testified the next thing he remembered was the police station, and how cold it was.  T. 548.  Counsel asked if Petitioner felt like he was still in danger and Petitioner stated that "[a]t that time . . . he was at the police station . . . handcuffed on the wall [Petitioner] fe[lt] safer than [he did] at [the] hospital."  T. 548-49.

The People cross-examined Petitioner.  T. 551-76.  The People asked about Petitioner's recollection of the events of April 19, 2016, from his fight with his wife, to his car breaking down, to all of the places he went to seeking help, and, ultimately, his arrest.  T. 551-53.  Petitioner stated he felt he was acting normally and he did not

16

understand why he was treated that way.  T. 553-54.  Petitioner recollected going to the hospital, being released, posting bail, returning to the hospital, being admitted, and being escorted to the third floor by security officers.  T. 554-56.  The prosecutor asked why Petitioner did not report his pain, and he explained he felt like "those people are not reliable. I didn't feel like [*sic*] to talk to them."  T. 557.  Petitioner also admitted he did not report seeing spirits or people in the walls.  T. 559-60.

The People asked why Petitioner did not ask what the problem was when he heard screaming coming from another room, and Petitioner answered that he "was afraid to ask."  T. 562.  Petitioner recalled wanting to call his wife and feeling afraid to tell hospital employees that he wanted to leave.  T. 566-67.  Petitioner testified that he did not remember forcing his way into the nurses' station, striking Paula Gonzales Putnam with a bed alarm, getting the key, or hitting either Paula or Vonny Surjoto-Lawrence with the blood pressure machine.  T. 569-70.  Petitioner stated he had never experienced the feeling he experienced while in the hospital and confirmed his memory regained when he was at the police station.  T. 572.  Petitioner repeated that he felt safer at the police station than at the hospital.  T. 574.

Following the People's cross-examination, the jury was excused for lunch.  T. 577-78.  After the break, Petitioner returned to the stand for re-direct examination.  T. 580-84.  In response to defense counsel's questions, Petitioner explained that he did not feel scared when he left his home on April 19, 2016, or when his car broke down, but he felt scared in jail and at the hospital.  T. 580-81.  Petitioner testified his fear was more severe at the hospital, stating he had never been that scared in his life.  T. 581-82.

Petitioner also explained he refused medicine because he felt that something was wrong.  T. 582.

The People re-crossed Petitioner.  T. 584-87.  Petitioner confirmed he felt more scared in the mental health unit, where he was permitted to walk around, than at the police station, where he was handcuffed and the officers carried guns.  T. 585-86.

### ii.    Dr. Jin

After Petitioner was excused from the stand, defense counsel called Dr. Xiaochun Jin to testify.  T. 588-630.  Dr. Jin explained that he was a licensed social worker and psychologist and associate professor of graduate-level clinical psychology. T. 588-97.  Defense counsel offered Dr. Jin as an expert in the field of psychology, the People did not object, and County Court so recognized him.  T. 597.

Dr. Jin testified that he examined Petitioner in person, on two occasions, and spoke to him over the phone.  T. 598.  The expert further stated he reviewed Petitioner's hospital records from his admission at St. Mary's Hospital.  T. 598-99.  Dr. Jin diagnosed Petitioner with having experienced "brief psychosis."  T. 599.  The expert explained he arrived at this conclusion after considering Petitioner's symptoms and the duration of those symptoms and ruling out other possible diagnoses.  T. 599-601.

Dr. Jin stated that when a patient is diagnosed with psychosis, he should be prescribed antipsychotic medication, as Petitioner was here; however, Petitioner refused to take the medicine.  T. 602-03.  The expert explained it is important for a person experiencing psychosis to take their medication because their judgement and insight are compromised, rendering them a potential threat to themselves or others.  T. 603-04.

Dr. Jin also testified that Petitioner exhibited some predisposition factors, meaning he was more likely to experience psychosis under stress, and Petitioner experienced a trigger for psychosis from the stress resulting from his interpersonal conflict with his wife.  T. 603-08.  The expert explained the symptoms of psychosis to the jury, including delusion, hallucinations, compromised insight, and compromised judgment.  T. 608.  Dr. Jin also explained that psychosis affects the memory, as psychosis impacts a person's cognitive functioning; therefore, in stressful situations, a person can experience psychogenic amnesia, or temporary memory loss due to stress. T. 609-10.  More specifically, he stated it would be possible for a person to remember the time before and after a stressful event in detailed memory but not the event itself.  T. 610.

Dr. Jin opined that Petitioner experienced a "clear trigger . . . a marked stressor" in the fight with his wife, "then he had a psychiatric breakdown, and . . . his condition became worse in the hospital because he started to see things . . . ."  T. 610-11.  The expert explained Petitioner's condition worsened as the night progressed, until Petitioner felt that he was going to die.  T. 611-12.  Defense counsel asked whether Petitioner's hallucinations could have triggered a state where Petitioner feared for his life, and Dr. Jin answered yes, explaining a person can experience a "fight-or-flight" instinct, a survival mechanism which would allow them to flee.  T. 615-16.

Dr. Jin also explained that in the Chinese community, there is a strong social stigma associated with mental health treatment and services and that some Chinese people face additional barriers to seeking such help.  T. 623-25.  Dr. Jin also stated that people are not involuntarily brought to a mental health unit unless it is necessary,

19

declaring "[p]olice d[o]n't bring people to a hospital for a psychiatric evaluation unless they s[ee] something clearly psychotic, very disorganized, . . . or violent."  T. 629.

The People cross-examined Petitioner's expert.  T. 630-68.  The People first inquired about Dr. Jin's familiarity with Dr. Osuma's reports in Petitioner's hospital records.  T. 631-44.  Dr. Jin explained the differences between the diagnosis of psychosis he gave to Petitioner and anti-social personality disorder with which Dr. Osuma diagnosed Petitioner with after the assaults.  T. 644-45.  The expert explained that anti-social personality disorder is "characterized by the person's ignor[ance] of other people's rights [and] feelings, repeatedly hurting people, [and] ha[ving] no regard for what's wrong and what's right . . . . "  T. 645.

The People next asked about Dr. Jin's own report.  T. 645-65.  Dr. Jin testified that Petitioner had no history of mental illness prior to April 19, 2016.  T. 655.  Dr. Jin then explained the depression and anxiety testing he administered to Petitioner and his results.  T. 656-58.  Dr. Jin also testified he ruled out a personality disorder diagnosis because Petitioner "d[id] not meet the criteria because he had no criminal records prior to" his April, 2016, arrest and the charged assaults.  T. 661.  The expert reported that during his evaluation, Petitioner did not exhibit any delusions or hallucinations, only some arguably borderline thoughts.  T. 665-66.

Defense counsel conducted a re-direct examination.  T. 668-77.  Defense counsel asked about the evaluation of Petitioner completed at St. Mary's Hospital, and Dr. Jin explained that the evaluator reported he was "[u]nable to elicit perceptions [and] unable to elicit insight[s]" but observed that Petitioner's "[j]udgment [wa]s poor."  T. 669.  Dr. Jin opined the evaluator may have had difficulty assessing Petitioner's perceptions

because of communication barriers, as there was no competent interpreter available for the evaluation.  T. 669-70.  Dr. Jin also testified that a psychiatrist would not prescribe antipsychotic medication without sufficient evidence that the patient was actually experiencing psychosis.  T. 673.  Defense counsel asked additional questions about the stigma associated with mental health issues in the Chinese community, and Dr. Jin stated some individuals delay treatment out of concern for how they will be perceived by others.  T. 673-77.

The People chose to re-cross Dr. Jin.  T. 677-78.  Dr. Jin confirmed that Petitioner's wife had not observed anything different about Petitioner in the days leading up to the assaults.  T. 678.

### 3.  Summation, Deliberations, and Verdict

Following the People's re-cross examination of Dr. Jin, the jury was excused for the evening and County Court adjourned proceedings.  T. 679-91.  The parties returned on September 27, 2016, whereupon the County Court first conducted a charge conference.  T. 694-725.  County Court confirmed the parties' satisfaction with the verdict sheet, reviewed standardized charges for jury instructions, discussed lesser included offenses, and reviewed the additional charges the parties agreed on.  T. 694-724.  The jury was seated and County Court delivered the pre-summation instructions.  T. 732-36.

Petitioner's attorney delivered the defense summation.  T. 736-44.  Defense counsel described to the jury that "[o]n April 19th . . . [Petitioner] was already acting under a state of psychosis[,]" after he experienced a "stressor" during the fight with his wife, then when Petitioner went for a drive, his car broke down, and he was arrested.  T.

736-38.  Counsel emphasized that Petitioner was visibly experiencing some kind of

mental problem, such that "even the police recognize[d] that there's something going on

with [Petitioner]" as evidenced by Petitioner's involuntary admission at St. Mary's

Hospital.  T. 738.

      Counsel reminded the jury that while Petitioner was at the hospital, according to

Dr. Jin's expert testimony, Petitioner was "under psychosis . . . [and] breaking down

systematically."  T. 740.  Petitioner's attorney recounted how Petitioner was "prescribed

Haldol, an antipsychotic medicine" but did not take it, therefore, Petitioner experienced:

> [S]ignificant stressors . . . to the point where he was
> experiencing hallucinations.  [Petitioner] was seeing
> apparitions.  [Petitioner] was hearing disembodied voices on
> a night that was perfectly peaceful.  [Petitioner] believe[ed]
> that there [was] screaming in the rooms adjacent to him
> because the nurses at St. Mary's Hospital are doing
> something to their patients in those rooms.

T. 741-42.  Defense counsel concluded, "Dr. Jin's testimony offered a plausible

explanation as to what happened."  T. 743.  Dr. Jin had opined that Petitioner's

psychosis "triggered a fight or flight response," and Petitioner "believed at the time that

his life was in danger."  T. 743-44.  Finally, defense counsel asked if the jury was able to

conclude that the People proved that Petitioner intended to hurt the nurses beyond a

reasonable doubt.  T. 744.

      The prosecutor next delivered the People's summation.  T. 744-62.  The People

discussed Petitioner's use of the bed alarm, phone, and blood pressure machine as

dangerous instruments.  T. 748-49.  The People then turned to intent, outlining

Petitioner's knowledge that he would need a key to exit the unit and reminding the jury

that he hit two nurses to obtain the keys.  T. 760-62.  The People challenged the

defense expert's credibility and argued that Dr. Jin's testimony was insufficient to prove the affirmative defense.  T. 752-55.

The People argued that Dr. Jin's conclusions were not as reliable because he did not evaluate Petitioner at the time of the attacks.  T. 753-54.  She also noted that Dr. Jin's diagnosis was largely based on information received from the Petitioner himself. T. 757.  The People also challenged Petitioner's credibility and his ability to remember nearly everything but the attack itself.  T. 759.  The People concluded that "the [d]efense has failed to meet their burden . . . [on] the affirmative defense . . . [and t]he record screams loudly in the contrary that in fact . . . [Petitioner] acted with clear intent to cause physical injuries" to the nurses.  T. 762.

After the jury was withdrawn, County Court turned to the reserved motion rulings. T. 763.  County Court denied Petitioner's motion for a trial order of dismissal, finding the People established a prima facia case on each charge.  T. 763-64.  County Court also denied Petitioner's request to include lesser offenses in the jury charge.  T. 764-65.

After the jury returned, the County Court instructed them on the law.  T. 766-809. Then the jury began deliberations.  T. 810. The jury was excused for the evening, and deliberations resumed the following morning.  T. 821-22, 825.  The jury returned a verdict that afternoon.  T. 842.  The jury found Petitioner guilty on both counts.  T. 843-46.

### C.  Sentencing

Petitioner reappeared before County Court on November 21, 2016, for sentencing.  T. 855-71.  Petitioner's attorney first made arguments on Petitioner's behalf.  T. 858-59.  Counsel argued "the evidence in the record shows that [Petitioner]

was suffering from an episode of psychosis" at the time of the assault and Petitioner

had no criminal history prior to this incident; furthermore, counsel requested the mercy

of the court.  T. 858-59.

The People next spoke and requested that County Court sentence Petitioner "to

the maximum sentence available, which would be two consecutive seven-year terms in

state prison."  T. 859.  The People argued that neither of the women Petitioner had

been convicted of assaulting ever returned to work at the Mental Health Unit at St.

Mary's Hospital and emphasized the nature and extent of their injuries.  T. 860-61.  The

People further argued Petitioner demonstrated "a complete lack of empathy in his

comments to the jury" and told the probation officer who conducted his pre-sentence

investigation that he "remember[ed] nothing."  T. 861.  Finally, the People argued that

Petitioner declined to seek mental health treatment until he sought a professional to

testify on his behalf at trial.  T. 862.

Petitioner's counsel responded that Petitioner faced some stigma in seeking

mental health treatment and asked County Court to consider the full context of the

events surrounding the assault when imposing sentence.  T. 863-64.  Petitioner also

spoke on his own behalf with the assistance of an interpreter, stating:

> I really did not intend to hurt [Vonny Surjoto-Lawrence and
> Paula Gonzales].  I never thought that I would hurt them. I
> never wanted to hurt them. I never thought of it.  And I never
> committed any kind of crime for anybody.  Come to think of it,
> I don't know what happened to me and I think I really had very
> serious mental illness.

T. 864.  Petitioner further stated he missed his wife and children, explaining his wife

needed assistance because she is unable to drive.  T. 864.  Next, Petitioner apologized

to the nurses, declaring:

> I'm very sorry. I didn't really know what I was doing. I'm so sorry. If I were normal, I don't think I would do anything like that at all. I didn't know them before and I didn't know why I -- you know, I had no intention to hurt them. At that time I was scared because I thought my life was in danger.

T. 865. Finally, Petitioner requested County Court's mercy in determining his sentence. T. 865.

County Court explained that it considered the evaluations from Petitioner's mental health providers, Petitioner's lack of criminal history, and the range of plea agreements that were offered by the People in determining Petitioner's sentence. T. 865. County Court also stated it was sympathetic to the position of Petitioner's wife and children. T. 865. However, County Court further explained it was obligated to balance these factors with the facts that Ms. Surjoto-Lawrence and Ms. Gonzales were "completely defenseless against [Petitioner's] attack . . . [which was] completely unprovoked . . . ." T. 865-66. County Court remarked that Petitioner had "viciously attacked" the nurses, causing them to suffer both "physical" and "lifelong emotional injuries[.]" T. 866.

For Petitioner's conviction of assault in the second degree under count one, County Court sentenced Petitioner to a determinate sentence of five years' incarceration in state prison and two years of post-release supervision. T. 866-67. County Court also sentenced Petitioner to five years' incarceration and two years' post-release supervision for his conviction of assault in the second degree under count two, to run concurrent with the sentence imposed for count one. T. 867-68.

**D. Direct Appeal**

Petitioner appealed the judgment of conviction to the Appellate Division, Third Department.  *See People v. Zi He Wu*, 161 A.D.3d 1396 (3rd Dept. 2018).[8]  In his brief, Petitioner argued: (1) he did not receive the effective assistance of counsel, as trial counsel "[f]ailed to [a]dequately [p]resent the [s]ole [d]efense [a]vailable" to Petitioner and was "[u]nfamiliar with the [r]ules of [e]vidence and of [c]riminal [p]rocedure[;]" and (2) his sentence was both "[e]xcessive and [i]mposed because [Petitioner e]xercised [h]is [r]ight to [p]roceed to [t]rial."  *See* SR 59-86, Petitioner's Appellate Division Brief. The People averred Petitioner received the effective assistance of counsel and Petitioner's sentence was neither unduly harsh nor an abuse of discretion.  *See* SR 273-85, The People's Appellate Division Brief.

The Appellate Division affirmed Petitioner's judgment of conviction.  *See Wu*, 161 A.D.3d at 1396-98.  Addressing Petitioner's ineffective assistance claim, the Third Department held:

> Defense counsel had the daunting task of defending a case where [Petitioner]'s actions on the night of the incident were beyond dispute. Defense counsel played this weak hand by giving late notice of, and successfully arguing for leave to present, the defense of mental disease or defect via the testimony of a clinical psychologist . . . The delay in asserting that defense was explained to County Court's satisfaction, and [Petitioner] gives no reason to believe that defense counsel's explanation was incorrect. Nothing in defense counsel's examination of the psychologist—in which counsel elicited the psychologist's knowledge of certain inconvenient facts in a seeming effort to show that the psychologist had considered them in forming an opinion as to [Petitioner]'s mental state—reflected a lack of preparation as opposed to valid strategy . . . Contrary to [Petitioner]'s contention, defense counsel elicited a clear opinion from the psychologist that [Petitioner] was psychotic at the time of the incident and that [Petitioner]'s worsening "delusion and hallucinations" led to the attacks. [Petitioner] further complains that he damaged his

---

[8] A copy of the Third Department's Decision is also included in the State Court Records.  *See SR* 341-44.

> [own] defense by exercising his right to testify, but there is nothing in the record to suggest that his decision to testify was anything other than voluntary, and the fact that he may now regret that decision does not establish that he was denied meaningful representation . . . [Petitioner] points to other purported deficiencies as well, but the record as a whole reveals that defense counsel handled a challenging case with aplomb and afforded [Petitioner] with meaningful representation.

*Id*. at 1397 (internal quotations, citations, and footnote omitted).

Turning to Petitioner's claims concerning sentencing, the Third Department held Petitioner "did not raise any issue with regard to the aggregate sentence despite having been afforded an opportunity to do so," therefore, he "failed to preserve his contention that the aggregate sentence reflected retaliation for [Petitioner's] decision to reject prior plea offers and demand the trial to which he was entitled." *Id*. at 1397-98.  Next, the Appellate Division explained, "the fact that [Petitioner]'s sentence was greater than that offered during plea negotiations does not demonstrate that he was penalized for proceeding to trial." *Id*. at 1398.  The Appellate Division noted:

> County Court stated what factors motivated it to impose a greater sentence than the ones contemplated by prior plea offers, pointing to the jury's rejection of [Petitioner]'s mental disease or defect defense, his failure to accept responsibility for his acts during the presentence investigation and the degree to which his acts wrought physical injuries and emotional impacts upon the victims. There was nothing retaliatory in this and, after considering those factors ourselves, we cannot say that extraordinary circumstances exist that render the sentence imposed harsh and excessive[.]

*Id*. (internal quotations and citations omitted).

Petitioner applied for leave to appeal.  SR 345-48.  The People opposed Petitioner's application for leave.  SR 349-51.  The Court of Appeals denied Petitioner's

application for leave on August 31, 2018.  *See People v. Zi He Wu*, 32 N.Y.3d 943 (2018).[9]

### E.  C.P.L. § 440 Motion

On January 16, 2019, Petitioner filed a motion to vacate his conviction pursuant to C.P.L. § 440.10 in Montgomery County Court.  *See* SR 353-74.  The People opposed Petitioner's motion.  *See* SR 375-80.  On June 3, 2019, County Court denied Petitioner's motion reasoning "the issues raised thereon were previously determined on the merits upon [Petitioner's direct] appeal[.]"  *See* SR 382 (citing C.P.L. § 440.10(2)(a)).[10]

## III.   PETITION

Petitioner challenges his 2016 judgment of conviction in Montgomery County, following trial, of two counts of assault in the second degree.  *See generally*, Pet. Petitioner argues that he is entitled to federal habeas relief because: (1) he was denied the effective assistance of counsel because trial counsel (a) failed to adequately present the sole defense available to Petitioner and (b) was unfamiliar with the rules of evidence and criminal procedure; and (2) Petitioner's sentence was excessive and imposed because he exercised his right to proceed to trial.  *See* Pet. at 11-20.  Respondent contends the Appellate Division reasonably rejected Petitioner's ineffective assistance claim, Petitioner's excessive sentence claim is not cognizable on habeas review, and

---

[9] A copy of the Court of Appeals' Decision is also included in the State Court Records.  *See SR* 352.
[10] *See generally*, C.P.L. § 440.10(2)

> [T]he court must deny a motion to vacate a judgment when: (a) The ground or issue raised upon the motion was previously determined on the merits upon an appeal from the judgment, unless since the time of such appellate determination there has been a retroactively effective change in the law controlling such issue[.]

Petitioner's vindictive sentencing claim is procedurally barred and meritless.  *See* Dkt. No. 6-1 at 18-27.

## IV.    DISCUSSION

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt."  *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (internal quotation marks and citation omitted).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

> Under the 'clearly established Federal law' clause, § 2254(d)(1), a state court adjudication is 'contrary to' Supreme Court precedent if it 'contradicts the governing [Supreme Court] law' or 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'

*Laboriel v. Lee*, No. 21-338-PR, 2022 WL 4479527, at *1 (2d Cir. 2022) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  An "unreasonable application of" clearly established federal law occurs when the state court "correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  *White v. Woodall*, 572 U.S. 415, 426 (2014).  Such holdings must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice."  *Id*. at 419 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)).

"Under the 'unreasonable determination of the facts' clause, § 2254(d)(2), a federal court will 'presume the correctness of state courts' factual findings unless [Petitioner] rebut[s] this presumption with clear and convincing evidence.'" *Laboriel*, 2022 WL 4479527, at *2 (quoting *Schriro*, 550 U.S. at 473-74 (quoting 28 U.S.C. § 2254(e)(1))).  "A state court decision is based on a clearly erroneous factual determination if the state court 'failed to weigh all of the relevant evidence before making its factual findings.'"  *Lewis v. Connecticut Commissioner of Correction*, 790 F.3d 109, 121 (2d Cir. 2015) (quoting *Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004); citing *Milke v. Ryan*, 711 F.3d 998, 1010 (9th Cir. 2013) (a state court decision is based on an "unreasonable determination of the facts" if the state court fails "to consider key aspects of the record")).

### A. Ineffective Assistance of Counsel Claim

Petitioner first argues he is entitled to federal habeas relief because he was denied the effective assistance of counsel.  *See* Pet. at 11-18.  As stated above, Petitioner argued trial counsel provided ineffective assistance on direct appeal, and the Appellate Division rejected Petitioner's claim.  *See Wu*, 161 A.D.3d at 1397.

Respondent avers the Appellate Division reasonably rejected Petitioner's ineffective assistance claim.  *See* Dkt. No. 6-1 at 18-23.

To establish that counsel was constitutionally ineffective, a convicted defendant must demonstrate (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  An ineffective assistance of counsel claim should be denied if the Petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See id*. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

In order to prove counsel's performance was deficient, "a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'"  *Harrington v. Richter*, 562 U.S. 86, 104 (2010) (quoting *Strickland*, 466 U.S. at 688).  In other words, "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id*. at 689.  A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  *Id*. (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Under *Strickland*'s second prong, counsel's performance is said to prejudice the defense where "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id*. at 687.  Therefore,"[t]o establish *Strickland*

prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105. When evaluating an ineffective assistance claim on habeas review, "the question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect[,] but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro*, 550 U.S. at 473) (internal quotations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. Therefore, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 102 (citing *Lockyer*, 538 U.S. at 71 (2003)).

Petitioner contends the attorney who represented him at trial "[f]ailed to [a]dequately [p]resent the [s]ole [d]efense [a]vailable to [Petitioner]" and was "[u]nfamiliar with the [r]ules of [e]vidence and of [c]riminal [p]rocedure[.]" *See* Pet. at 11-18. Petitioner alleges counsel's performance was deficient on several occasions, each of which prejudiced his defense. *See* Pet. at 11-18. Alternatively, Petitioner avers the

cumulative effect of counsel's deficiencies amounts to ineffective assistance.  *See* Pet. at 18.

### 1.  Failure to Adequately Present the Sole Defense Available

Under N.Y.P.L., "[i]n any prosecution for an offense, it is an affirmative defense that when the defendant engaged in the proscribed conduct, he lacked criminal responsibility by reason of mental disease or defect."  N.Y.P.L. § 40.15.  "Such lack of criminal responsibility means that at the time of such conduct, as a result of mental disease or defect, [the defendant] lacked substantial capacity to know or appreciate either: (1) The nature and consequences of such conduct; or (2) That such conduct was wrong."  *Id*.  In the instant petition, Petitioner suggests that the affirmative defense of not guilty by reason of mental disease or defect was "the [s]ole [d]efense [a]vailable to [Petitioner.]"  *See* Pet. at 11 ("the evidence against [Petitioner] on the basic elements of assault in the second degree [was] going to be hard to dispute . . . . ").  Petitioner argues trial counsel's performance was deficient, resulting in prejudice to Petitioner's defense because counsel: failed to properly give notice of Petitioner's affirmative defense; was not able to properly advise Petitioner on plea offers made by the People; failed to adequately prepare an expert witness to present the defense; allowed the expert witness to open the door to a hearsay report; allowed the "destruction" of the expert witness's testimony on cross-examination; and failed to properly present the defense on summation.  *See generally* Pet. at 11-15.

### i.  Notice of Defense

In support of his ineffective assistance claim, Petitioner avers, "[i]nstead of properly giving notice of this defense pursuant to C.P.L. § 250.10, counsel, on the very

day prior to trial filed a motion to use such a defense." Pet. at 11. New York's Criminal

Procedure Law states:

> Evidence of mental disease or defect, to be offered by the defendant in connection with the affirmative defense of lack of criminal responsibility by reason of mental disease or defect, . . . is not admissible upon a trial unless the defendant serves upon the people and files with the court a written notice of his intention to present psychiatric evidence . . . before trial and not more than thirty days after entry of the plea of not guilty to the indictment.

C.P.L. § 250.10(1)(a)&(2). However, the statute further provides that, "[i]n the interest

of justice and for good cause shown . . . the court may permit such service and filing to

be made *at any later time prior to the close of the evidence*." *Id*. § 250.10(2) (emphasis

added).

On September 21, 2016, the first day of trial, County Court first noted that

morning that it had received a motion from Petitioner made in accordance with C.P.L. §

250.10, dated September 20, 2016. T. 6. County Court observed the notice of intent

had not been timely filed, but acknowledged the law permits late notice "if good cause is

show" and allowed the parties to present argument on Petitioner's potential use of the

defense. T. 6.

Petitioner's attorney argued there was "ample good cause here" as reports

proved Petitioner "suffer[ed] from psychosis . . . [and] hallucinations" and it was

apparent that Petitioner was experiencing something of concern from the moment he

was first brought to St. Mary's hospital by the Montgomery County Sheriff's Office. T. 6-

7. Counsel further averred Petitioner's attorneys had "in good faith . . . tried to obtain a

report as quickly as possible" and that Petitioner's ability to present the affirmative

defense involved "an important Constitutional Right"; therefore, it would be in the interest of justice to allow late notice of the defense.  T. 7-8.

County Court asked for further explanation as to why Petitioner was not evaluated by Dr. Jin until September 9, [2016], and counsel explained "there's a significant stigma associated with mental health disease in [Petitioner]'s community at large . . . the Chinese community . . . that could cost [a person] to be ostracized by friends [and] family."  T. 8.  Counsel further explained it was Petitioner's attorneys who "essentially asked him to . . . see a mental health evaluator because [Petitioner's] actions don't comport necessarily with what most people would consider normal."  T. 9.

The People argued that Petitioner's counsel had failed to present arguments concerning the delay in providing notice, the issue of Petitioner's mental health should have been known from the time of Petitioner's arraignment in June, and the records from St. Mary's Hospital had been delivered to the People in August.  T. 10-11.  Further, the A.D.A. stated that it would prejudice the People to introduce an additional element to the trial when testimony was planned to begin the following day and urged County Court to preclude evidence because Petitioner willfully refused to cooperate in an examination sooner.  T. 12.

Petitioner's attorney responded that the People were "essentially on constructive notice [that such an affirmative defense could be presented] since the point [Petitioner] was brought by Montgomery County Sheriff's Office to the mental health unit of St. Mary's."  T. 12.  Defense counsel further argued "five months . . . [was] not unreasonable in terms of obtaining a mental health evaluation and receiving a report that has to diagnose [Petitioner] with certain types of ailments . . . . "  T. 13.  The People

stated while there was an inclination that Petitioner had a mental health issue, the issue of whether he lacked criminal responsibility was a distinct matter.  T. 14.

County Court explained it would reserve its ruling on the matter and give the People the lunch recess to review Petitioner's submissions and conduct their own research.  T. 14-15.  After the jury was empaneled and excused, T. 23-176, County Court continued hearing arguments on the affirmative defense.  T. 177.

Relying on *People v. Berk*,[11] the People explained the time requirement established in C.P.L. § 250.10 served several purposes– it requires the defendant to provide notice of use of the affirmative defense to avoid prejudice to the People, ensures that a defendant can be examined as contemporaneously to the events as possible, and helps to avoid delays in trial.  T. 177-79.  Moreover, A.D.A. argued the People would be deprived of the opportunity to have Petitioner evaluated by a psychiatric expert if Petitioner were allowed to proceed despite his untimely notice.  T. 178-80.  The A.D.A. further contended Dr. Osuma– who treated Petitioner at the hospital and had the best opportunity to examine Petitioner contemporaneously –had retracted his original diagnosis of psychosis and considered the possibility that Petitioner "was feigning psychosis for some type of secondary gain."  T. 180.

Petitioner's trial counsel responded that the exclusion of such testimony would be a significant sanction for Petitioner's failure to comply with a statutory notice requirement that implicates Petitioner's constitutional rights.  T. 182-83.  Counsel further affirmed Petitioner would be available for the People's expert's evaluation if he would be allowed to proceed with the defense.  T. 185.  The People argued the majority of Dr.

---

[11] *See generally People v. Berk*, 88 N.Y.2d 257, 261-63 (1996).

Jin's report was based on Petitioner's own statements about his symptoms.  T. 188.

County Court announced it would reserve its decision until the following morning.  T.

190.

When the parties returned the following morning, County Court granted

Petitioner's motion to present psychiatric evidence.  T. 198.[12]  As discussed in greater

detail below, Petitioner did, in fact, present psychiatric evidence by calling Dr. Jin to

testify in his defense.  T. 587-678.  Therefore, Petitioner's argument that he was denied

the effective assistance of counsel based on his attorney's failure to properly file notice

in the manner required by C.P.L. § 250.10 is meritless.  Regardless of when the notice

was offered, Petitioner's trial counsel presented a cogent and persuasive argument and

the jury was permitted to hear psychiatric evidence presented by the defense's expert

witness.

In sum, Petitioner is unable to establish that his defense was prejudiced by

counsel's failure to properly give proper notice of Petitioner's intent to use the

affirmative defense.  Because Petitioner is unable to establish prejudice, his ineffective

assistance of counsel claim fails.  *See Strickland*, 466 U.S. at 697 (explaining, "there is

no reason for a court deciding an ineffective assistance claim to . . . address both

components of the inquiry if the defendant makes an insufficient showing on one.").

### ii.    Advice on Plea Offers

---

[12] County Court further explained it would allow the People to have Petitioner examined and was willing to grant an adjournment for the People to do so.  T. 198.  However, the People declined to have Petitioner examined, explaining "the best testimony would come from the psychiatric Doctor that treated [Petitioner] at St. Mary's Hospital in and around the time of these events . . . Dr. Osu[m]a" and added the doctor to the People's witness list.  T. 198.

Further concerning the timeliness of trial counsel's assertion of the affirmative defense, Petitioner avers:

> [C]ounsel was aware of the facts of the case from its inception, i.e., that [Petitioner] had committed the crimes he was accused of while a patient in a psychiatric ward at St. Mary's Hospital . . . To have waited until 3 weeks before trial to have even considered what defense to use was not just prejudicial, but unconscionable. Without having a cogent defense, a competent attorney could not have properly advised [Petitioner] to turn down any plea offers made by the people.

Pet. at 15 (citations omitted). As an initial matter, Petitioner has not offered any evidence to suggest that trial counsel did not "consider[]" using the affirmative defense prior to the three weeks before trial. To the contrary, Petitioner's attorney explained, and County Court accepted, that counsel "tried to obtain a report as quickly as possible" but was unable to do so sooner because of the "significant stigma associated with mental health disease" in Petitioner's community. T. 7-8.

Turning to counsel's allegedly deficient performance in advising Petitioner with respect to plea offers, the Supreme Court has explained that a defendant claiming prejudice from rejecting a plea offer and standing trial:

> [M]ust show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler*, 566 U.S. at 164. Here, Petitioner has failed to allege, let alone prove, that if counsel had submitted notice of Petitioner's intent to use the affirmative defense sooner, there is a reasonable probability that the People would have presented a plea

38

offer containing a lesser conviction or sentence *that both Petitioner and the County Court would have accepted*. *See* Pet. at 15. Petitioner's vague claim that counsel "could not have properly advised him" is insufficient to demonstrate prejudice under *Strickland*. Pet. at 15. Therefore, he is not entitled to habeas relief on this basis.

### iii.    Preparation of the Expert Witness

Petitioner next contends that trial counsel provided ineffective assistance because "[i]t is clear from the record that defense counsel did nothing to prepare [the not guilty by reason of mental disease or defect] defense properly." Pet. at 12. In support of this claim, Petitioner cites the fact that trial counsel "retained an 'expert' only a few weeks prior to trial . . . [the expert] met with [Petitioner] . . . a mere 18 days and 11 days prior to the trial . . . [and counsel received the report] . . . a day before the trial began." Pet. at 12 (citations omitted). Therefore, Petitioner claims trial counsel was deficient because:

> Based upon this schedule, there was absolutely no possible way that the witness, Dr. Jin[,] could possibly have been properly prepared to testify on behalf of [Petitioner]. This is clear by reading his testimony . . . While Dr. Jin explained to the jury that he believed that [Petitioner] had suffered from a brief psychosis at the time of the incident, and that [Petitioner] likely suffered a break from reality, Counsel never elicited the evidence that [Petitioner] did not have the ability to appreciate the nature or consequences of his actions, or that [Petitioner] did not know that what he was doing was wrong.

Pet. at 12-13 (citations omitted). As explained above, in rejecting Petitioner's ineffective assistance claim, the Third Department found that "defense counsel elicited a clear opinion from the psychologist that [Petitioner] was psychotic at the time of the incident and that [Petitioner's] worsening 'delusion and hallucinations' led to the attacks." *Wu*, 161 A.D.3d at 1397.

At trial, defense counsel called Dr. Jin to testify in Petitioner's defense following Petitioner's own testimony.  T. 587.  Dr. Jin first testified he had studied both Chinese linguistics and clinical psychology, receiving a master's degree in social work and a doctorate degree in clinical psychology.  T. 588-89.  Dr. Jin explained the focus of clinical psychology is "diagnosis and treatment of mental illness . . . . "  T. 589.  After Dr. Jin further described his background, defense counsel offered Dr. Jin as an expert in the field of psychology, the People did not object, and County Court so recognized him as an expert.  T. 597.

Dr. Jin testified that in preparation for trial, he "examined [Petitioner] on two occasions in person . . . for a total of four hours [of] face to face interview[s], and . . . [spoke to Petitioner] many times over the phone . . . . "  T. 598.  Dr. Jin explained he also reviewed all of Petitioner's "evaluation and [other] documents" from St. Mary's hospital.  T. 598.  Dr. Jin opined that based on his interviews of Petitioner and review of Petitioner's hospital records, he diagnosed Petitioner as having suffered from a "[b]rief psychosis."  T. 599.  Dr. Jin explained a diagnosis requires exhibiting symptoms of "[d]elusion, hallucination, disorganized speech[, or] disorganized behavior" for a duration of "more than one day but less than one month."  T. 599-600.

Later in his testimony, Dr. Jin explained certain factors may trigger a person to experience symptoms of psychosis and that Petitioner exhibited some of these risk factors.  T. 604-07.  Dr. Jin next testified "the strongest trigger for psychosis . . . is interpersonal conflicts which is exactly what happened to [Petitioner]."  T. 607.  Dr. Jin opined that "[w]hen a person has an active psychosis . . . their judgement and insight are compromised, and often they don't even know what they [are] doing."  T. 608.

40

Dr. Jin further explained psychosis can affect a person's memory, testifying that "[i]n psychosis[,] the person's cognitive function[,] which include[s] memory . . . tend[s] to be compromised," which can result in "psychogenic amnesia[,] which means temporary memory loss due to stress."  T. 609.  In response to questioning, Dr. Jin agreed that a person could remember events before or after a stressful event completely but not remember the event itself.  T. 610.  Therefore, the expert concluded Petitioner experienced "a clear trigger" after the interpersonal conflict with Petitioner's wife "and then he had a psychiatric breakdown" evidenced by Petitioner's worsening condition in the hospital.  T. 610-11.

Dr. Jin opined, "I think [Petitioner] was delusional hallucinating from the beginning, but as the day [passed] it was so dark [Petitioner] became more and more anxious and more and more paranoid. [Petitioner's] delusion and hallucination got much worse . . . . "  T. 613.  Dr. Jin agreed that if a person's hallucinations appear real to them, it could trigger a state where that person fears for their life, and engages a sort of survival mechanism.  T. 615-16.  Following the People's cross examination, defense counsel conducted a re-direct examination of the expert and Dr. Jin repeated his conclusion that "[b]ased on [his] interview [of Petitioner] and hospital records . . . all the evidence suggests that [Petitioner] was having psychosis at the time of hospitalization, at the time when he was picked up by the police."  T. 671.

The above testimony contradicts Petitioner's claim that trial counsel failed to adequately prepare Dr. Jin to testify in Petitioner's defense.  In order to prevail on his affirmative defense, Petitioner was required to establish that at the time of the charged assault, "as a result of mental disease or defect, he lacked substantial capacity to know

or appreciate either: (1) The nature and consequences of [his allegedly criminal] conduct; or (2) That such conduct was wrong."  P.L. § 40.15.  Trial counsel elicited testimony from Dr. Jin that at the time of the assault, Petitioner experienced a "[b]rief psychosis" and that a person experiencing psychosis suffers from compromised judgment and insight such that "they don't even know what they are doing."  T. 599, 608.

Dr. Jin's testimony that a person experiencing psychosis does not know what they are doing coupled with his opinion that Petitioner was experiencing psychosis on the night he assaulted the hospital nurses provided sufficient evidence for the jury to conclude that as a result of the brief psychosis, Petitioner lacked the capacity to know or appreciate the nature and consequences of his conduct or that his conduct was wrong. Therefore, the undersigned is unable to conclude that the Third Department's determination that "defense counsel elicited a clear opinion from the psychologist that [Petitioner] was psychotic at the time of the incident and that [Petitioner's] worsening 'delusion and hallucinations' led to the attacks" thus affording Petitioner meaningful representation was, "unreasonable."  *Wu*, 161 A.D.3d at 1397; *see also Knowles*, 556 U.S. at 123.  Accordingly, Petitioner is not entitled to habeas relief on the ground that trial counsel failed to adequately prepare Dr. Jin to testify.  *See Gillis v. Edwards*, 445 F. Supp. 2d 221, 232 (N.D.N.Y. 2006) (rejecting Petitioner's claim "that his attorney failed to adequately prepare the expert witness" concluding "[t]he fact that [the expert witness]'s testimony clearly supported [Petitioner's] defense that he lacked the mental capacity to appreciate that his conduct was wrong strongly suggests that defense counsel both prepared and consulted with [the expert witness] prior to trial.").

### iv.    "Opening the Door" to Dr. Osuma's Hearsay Report

Petitioner further contends that trial counsel's performance was deficient

because "defense counsel opened the door to the sole evidence that demonstrated that

[Petitioner] was not suffering from a mental disease or defect at the time he committed

the assault."  Pet. at 13.  Petitioner argues:

> Dr. Jin volunteered that the [e]mergency room doctor, Dr.
> Osuma, initially found that Mr. Wu was suffering from
> psychosis but that Dr. Osuma changed his diagnosis after the
> event . . . This opened the door to the People's cross-
> examination regarding nearly all of Dr. Osuma's report, which
> included the fact that Dr. Osuma did not actually diagnose
> [Petitioner] as being psychotic . . . This error by defense
> counsel resulted in [Petitioner] being denied his right to
> confront a prosecution witness whose report certainly
> contained enough inconsistencies to be helpful to the defense
> cause.

Pet. at 13 (citations omitted).  In denying Petitioner's ineffective assistance claim, the

Third Department held that "[n]othing in defense counsel's examination of the

psychologist—in which counsel elicited the psychologist's knowledge of certain

inconvenient facts in a seeming effort to show that the psychologist had considered

them in forming an opinion as to [Petitioner]'s mental state—reflected a lack of

preparation as opposed to valid strategy."  *Wu*, 161 A.D.3d at 1397.

As explained above, in order to prevail on his affirmative defense, Petitioner was

required to prove that "*at the time of such conduct*, as a result of mental disease or

defect, [the defendant] lacked substantial capacity to know or appreciate either: (1) The

nature and consequences of such conduct; or (2) That such conduct was wrong."

N.Y.P.L. § 40.15 (emphasis added).  Therefore, defense counsel sought to persuade

the jury that Petitioner, as a result of his psychosis, lacked the substantial capacity to

43

know or appreciate the nature and consequences of his conduct in injuring the nurses *at the time he caused those injuries*.

In order to give an opinion on whether Petitioner suffered from a mental disease or defect at the time of the charged assaults, Dr. Jin explained he relied on both his own examination of Petitioner and hospital records from the time of the alleged assaults. T. 598-99. Dr. Jin explained a diagnosis of brief psychosis must be made based on factors including the symptoms Petitioner experienced and the duration of those symptoms. T. 599.[13] Because Dr. Jin did not evaluate Petitioner during his admission to the mental health unit, he did not have personal knowledge of what symptoms Petitioner experienced prior to and during the alleged assault. In order to determine what symptoms Petitioner experienced, Dr. Jin was dependent on either Petitioner's own lay reports about his symptoms, the hospital records, or both.

Trial counsel cannot be faulted for the expert witness's decision to utilize a source other than Petitioner himself in ascertaining what symptoms Petitioner experienced. As the Petitioner testified at trial, he lacked recollection of portions of the night in question.[14] Accordingly, Dr. Jin's reliance on the reports drafted by hospital staff at the time of Petitioner's conduct was necessary to develop a diagnosis.

---

[13] Additionally, Dr. Jin stated in diagnosing Petitioner with psychosis, he "ha[d] to rule out other possibilities such as substance abuse psychosis"; therefore, he relied on a blood test conducted by the hospital. T. 600.

[14] *See, e.g.*, T. 547-48.

> [Defense Counsel]: So what did you do after that?
> [Petitioner]: I don't remember. All my thinking was I have to get out of here.
> [Defense Counsel]: Do you remember getting the keys?
> [Petitioner]: I don't remember.
> [Defense Counsel]: Do you remember hurting anybody?
> [Petitioner]: I don't remember hurting anyone. All I had was I have to get out of here.
> [Defense Counsel]: So what do you remember next?
> [Petitioner]: I just remember the police station . . . .

Therefore, trial counsel was not deficient for allowing Dr. Jin to testify that he relied on Petitioner's hospital records, including Dr. Osuma's evaluations, in concluding Petitioner experienced a brief psychosis at the time of the assaults.

Concerning Dr. Jin's admission of knowledge that Dr. Osuma included a diagnosis other than psychosis in the hospital reports, Petitioner remains unable to establish that a violation of *Strickland*.  During trial counsel's direct examination, Dr. Jin testified that "based on [his] interview [with Petitioner and] based on [his] review of the hospital records" he reached a diagnosis, which "consistent with the hospital psychiatrist [Dr. Osuma's] . . . initial diagnosis."  T. 599.  Dr. Jin explained "Dr. Osuma did two evaluations, and he concluded that [Petitioner] was having psychotic disorder . . . [however,] Dr. Osuma later changed his diagnosis at the time of discharge . . . ."  T. 599.  Defense counsel later asked Dr. Jin to explain how a psychologist could change a diagnosis, and Dr. Jin answered that changing a diagnosis requires "strong evidence" and that changing a diagnosis is "very unusual."  T. 622.

Although Dr. Jin's testimony about Dr. Osuma's diagnoses necessarily "opened the door" to further discussion of the hospital records on cross examination, the Second Circuit has explained that "courts should not confuse true ineffectiveness with losing trial tactics or unsuccessful attempts to advance the best possible defense."  *Henry v. Poole*, 409 F.3d 48, 58 (2d Cir. 2005).  By acknowledging that Dr. Osuma's diagnosis of Petitioner, which was inconsistent with his own, Dr. Jin was able to explain why he believed the diagnosis of "psychosis" was more applicable.  *See, e.g.*, T. 661 ("the anti-social personality disorder Dr. Osuma would like to give retroactively does not . . . meet the criteria because [Petitioner] had no criminal records prior to this.").  By explaining

how it is unusual to change a diagnosis, Dr. Jin was able to rebut a conclusion which was inconsistent with Petitioner's theory of the defense.

Although Dr. Jin's testimony that Petitioner suffered from psychosis rather than anti-social personality disorder at the time of the assaults may have been an "unsuccessful attempt to advance the best possible defense[,]" trial counsel did not provide ineffective assistance by allowing the expert to give that testimony.  In sum, because trial counsel's performance did not fall below an objective standard of reasonableness by allowing the defense expert to testify about the sources he relied on in reaching his conclusion, Petitioner cannot establish that the Third Department's determination that Petitioner was afforded meaningful representation was "unreasonable."  *See Wu*, 161 A.D.3d at 1397; *see also Knowles*, 556 U.S. at 123.

### v.    "Destruction" of the Expert's Testimony on Cross-Examination

Petitioner next argues "[t]he lack of preparation by the defense team also opened the door to the People's utter destruction of Dr. Jin's methods and ability to form a proper opinion in such a short time."  Pet. at 13.  In support of this argument, Petitioner cites a portion of the People's cross examination of the expert witness where Dr. Jin admitted: he had not interviewed any of the witnesses to the assault; Petitioner's wife reported to Dr. Jin that she had not noticed anything wrong with Petitioner prior to the assault; Petitioner had no history of mental illness prior to the assaults; Petitioner was not, at the time of the trial, receiving mental health treatment from Dr. Jin; and based on Petitioner's performance on two tests, he was neither clinically depressed nor suffering from anxiety at the time of evaluation.  *See* Pet. at 13; T. 654-57.

"It is well-settled in this Circuit that vague and conclusory allegations that are unsupported by specific factual averments are insufficient to state a viable claim for habeas relief . . . [Therefore,] claim[s] of ineffective assistance must contain specific factual contentions regarding how counsel was ineffective." *Kimbrough v. Bradt*, 949 F. Supp. 2d 341, 355 (N.D.N.Y. 2013) (collecting cases). Petitioner does not explain how counsel's performance was deficient and instead relies solely on the conclusory allegation that counsel was not adequately prepared. Nor does Petitioner explain how, for counsel's purported lack of preparation, the result of the proceeding would have been different. Therefore, this vague allegation of improper preparation is insufficient to support a claim of ineffective assistance. *See Sweat v. United States*, No. 3:05-CV-0221 (TJM), 2005 WL 3179672, at *8 (N.D.N.Y. Nov. 29, 2005) ("Petitioner's generalized and vague claims of counsel's ineffectiveness . . . are insufficient to state a *Strickland* claim.") (citing, *inter alia*, *Slevin v. United States*, No. 1:98-CV-0904, 1999 WL 549010 at *5 (S.D.N.Y. July 28, 1999) ("Petitioner has not elaborated on how counsel's alleged general lack of preparation prejudiced the outcome of his trial. Accordingly, such purported lack of preparation cannot be deemed ineffective assistance of counsel.")); *Hartley v. Senkowski*, No. 1:09-CV-395, 1992 WL 58766, at *2 (E.D.N.Y. Mar. 18, 1992) (finding "[i]n light of [*Strickland*'s] demanding standard, petitioner's vague and conclusory allegations that counsel did not prepare for trial or object to errors carry very little weight.").

### vi.    Summation

Finally, Petitioner argues trial counsel's summation was deficient. *See generally*, Pet. at 13-14. The Supreme Court has explained:

> The right to effective assistance extends to closing arguments . . . Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should sharpen and clarify the issues for resolution by the trier of fact . . . but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether . . . Judicial review of a defense attorney's summation is therefore highly deferential- and doubly deferential when it is conducted through the lens of federal habeas.

*Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (citing *Bell v. Cone*, 535 U.S. 685, 701-702 [] (2002); *Herring v. New York*, 422 U.S. 853, 865 (1975)) (internal quotations and additional citations omitted).

First, Petitioner asserts "[e]ven though the People had not offered any expert testimony to contradict Dr. Jin's analysis and diagnosis, [d]efense counsel failed to remark this in his 7-page summation." Pet. at 13. Petitioner further argues:

> A competent attorney would have pointed out to the jury that the People had not offered any expert testimony in opposition to that of Dr. Jin. Competent defense counsel would have argued that Dr. Jin's testimony was uncontested and uncontradicted. Competent defense counsel would have argued that the jury had no evidence to conclude that the defendant had not been suffering from a psychotic episode at the time of the commission of the crime, when the only evidence available to contradict this finding was the change of heart of an emergency room doctor, after the fact.

Pet. at 14. Respondent avers this claim is based on "confusion about the burden of proof" and the undersigned agrees. *See* Dkt. No. 6-1 at 20.

New York's highest court has explained that "Penal Law § 40.15 specifically makes insanity an 'affirmative defense'. Thus, the entire burden of proof, *both production and persuasion*, is placed on the defendant; it never shifts to the prosecution

48

. . . . " *People v. Kohl*, 72 N.Y.2d 191, 207 n.2 (1988).  Therefore, the People were not required to disprove Petitioner's theory that he lacked the substantial capacity to know or appreciate either the nature and consequences of his conduct or that such conduct was wrong.  *See* N.Y.P.L. § 40.15.  In other words, it would have been inconsistent with the law for Petitioner's attorney to suggest that the People were required to offer testimony contesting that offered by the defense expert.

Counsel's performance cannot fall below an objective standard of reasonableness because he did not make an argument that was inconsistent with the law.  To the contrary, it is well established that "[t]he failure to make a meritless argument does not rise to the level of ineffective assistance . . . . "  *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995) *cert. denied*, 516 U.S. 927 (1995). Accordingly, trial counsel's omission of an argument on summation that the People failed to offer expert testimony to contradict Dr. Jin's conclusions did not deprive Petitioner of the effective assistance of counsel.

Petitioner next argues counsel's summation was deficient because "counsel never set forth the elements which must be proven to support the insanity defense in any way, shape or form . . . defense counsel argued only that [Petitioner] did not intend to assault the victims of the case."  Pet. at 13-14 (citations omitted).  As an initial matter, trial counsel's summation was not deficient because counsel failed to explain to the jury the requirements of the affirmative defense.  *See, e.g., Sweeper v. Graham*, No. 1:14-CV-6346, 2017 WL 4516645, at *7 (S.D.N.Y. Sept. 26, 2017) ("To the extent that petitioner appears to argue that counsel should have instructed the jury about legal

principles, such a claim is obviously without merit. The court, not counsel, instructs the jury on the law.") (citations omitted).

Moreover, it is clear from the record that County Court so instructed the jury here. Immediately prior to defense counsel's delivery of the summation, County Court informed the jury that "I am responsible for explaining the law to you, not the [l]awyers." T. 734. After the attorneys delivered closing arguments, County Court instructed the jury on the law, explaining:

> Under our law it is an affirmative defense to the crime charged that when the Defendant engaged in the prohibited conduct he lacked criminal responsibility by reason of mental disease or defect. A person lacks criminal responsibility by reason of mental disease or defect when, at the time of the prohibited conduct, as a result of mental disease or defect[,] that person lacked substantial capacity to know or appreciate either, one, the nature and consequences of such conduct or, two, that such conduct was wrong . . .
> Let's examine that definition. First, the lack of substantial capacity to know or appreciate must have existed at the time the prohibited conduct was committed.
> Second, the lack of substantial capacity to know or appreciate must have been the result of mental disease or defect.
> Third, a lack of substantial capacity to know or appreciate does not require a lack of total capacity to know or appreciate. Fourth, the term know or appreciate means to have some understanding. It means more than surface knowledge . . .
> Fifth, with respect to the term wrong, a person lacks substantial capacity to know or appreciate the conduct was wrong if that person, as a result of mental disease or defect, lacks substantial capacity to know or appreciate either that the conduct was against the law or that it was against commonly held moral principles or both . . .
> [I]f you find that the Defendant has proven the affirmative defense by a preponderance of the evidence then you must find the Defendant not responsible by reason of mental disease or defect for that crime . . . .

T. 786-90; *see also* T. 795-800 (repeating the instruction for the conduct charged in count two). "A jury is presumed to follow its instructions" and Petitioner has not

suggested the jury failed to do so here. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Blueford v. Arkansas*, 566 U.S. 599, 606 (2012).

To the extent Petitioner merely argues defense counsel did not sufficiently argue that the evidence supported the conclusion that Petitioner lacked responsibility at the time of the charged assaults, he is also incorrect. The record demonstrates that counsel described for the jury how the testimony presented by both the People and the defense supported the theory that Petitioner was suffering from a mental defect at the time of the incident such that he could not know or appreciate his conduct or that such conduct was wrong.

On summation, defense counsel described how "[o]n April 19th . . . [Petitioner] was already acting under a state of psychosis[,]" as Petitioner experienced a "stressor" during the fight with his wife, and when Petitioner went for a drive, his car broke down, and Petitioner was arrested. *See* T. 735-38. Next, counsel emphasized that Petitioner was visibly experiencing a mental problem, such that "even the police recognize[d] that there's something going on with [Petitioner]" and took him to the hospital. T. 738. Counsel reminded the jury that while Petitioner was at the hospital, according to Dr. Jin's expert testimony, Petitioner was "under psychosis . . . [and] breaking down systematically. You can see his mindset breaking down systematically." T. 740. Petitioner's attorney recalled that testimony established Petitioner was "prescribed Haldol, an antipsychotic medicine" but did not take it, and as the night progressed, Petitioner experienced:

> [S]ignificant stressors . . . to the point where he was experiencing hallucinations. [Petitioner] was seeing apparitions. [Petitioner] was hearing disembodied voices on a night that was perfectly peaceful. [Petitioner] believe[ed]

> that there [was] screaming in the rooms adjacent to him because the nurses at St. Mary's Hospital are doing something to their patients in those rooms.

T. 741-42.  Defense counsel argued "Dr. Jin's testimony offered a plausible explanation as to what happened."  T. 743.

Petitioner avers, "[a]lthough Dr. Jin may not have given the exact formulation to make out the insanity defense during his testimony, a competent attorney would have pieced together what evidence existed to offer the jurors a roadmap to such a finding in his summation."  Pet. at 14.  It is clear from the above-referenced portions of the record that counsel did so here.  In sum, any claim that trial counsel did not adequately address the affirmative defense in summation– especially in light of broad range of legitimate strategy appropriate in closing presentations –is meritless.

### 2. Unfamiliarity with the Rules of Evidence and Criminal Procedure

Petitioner next avers that he was deprived of the effective assistance of counsel because his attorneys were "[u]nfamiliar with the [r]ules of [e]vidence and of [c]riminal [p]rocedure[.]"  *See* Pet. at 15-18.  Petitioner argues trial counsel's performance was deficient resulting in prejudice to Petitioner's defense because counsel: called Petitioner as a witness; failed to object to cumulative and improperly formed questions during the People's cross-examination of Petitioner; failed to object to hearsay statements made by Dr. Osuma; objected to statements made by Petitioner as hearsay; offered medical records without a witness and proper foundation; failed to object to testimony that Petitioner carried cash and cocaine on his person; filed no post-trial motions; and failed to remind County Court of lower sentences offered during plea negotiations.  *See* Pet.

at 15-18.  The County Court addresses each instance of allegedly deficient performance below.

### i.    Decision to Call Petitioner as a Witness

Petitioner asserts, "demonstrating counsel's unfamiliarity with P.L. § 40.15 and the appropriate way to present this defense, counsel called [Petitioner] as a witness, subjecting him to a cross-examination which formed almost the entirety of the People's summation."  Pet. at 15.  On direct appeal, the Third Department observed that Petitioner "complains that he damaged his defense by exercising his right to testify, but there is nothing in the record to suggest that his decision to testify was anything other than voluntary, and the fact that he may now regret that decision does not establish that he was denied meaningful representation[.]"  *Wu*, 161 A.D.3d at 1397 (internal quotation and citations omitted).

Any suggestion that counsel was ineffective because trial counsel called Petitioner to testify on his own behalf is meritless.  As the Second Circuit has explained,

> Although counsel should always advise the defendant about the benefits and hazards of testifying and of not testifying, and may strongly advise the course that counsel thinks best . . . the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision on this matter.

*Brown v. Artuz*, 124 F.3d 73, 79 (2d Cir. 1997); *see also United States v. Gomez*, 705 F.3d 68, 79 (2d Cir. 2013).[15]

---

[15] Therefore, "any claim by the defendant that defense counsel has not discharged this responsibility—either by failing to inform the defendant of the right to testify or by overriding the defendant's desire to testify—must satisfy the two-prong test established in *Strickland v. Washington* . . . ."  *Brown*, 124 F.3d at 79.

Significantly here, Petitioner does not suggest that trial counsel either failed to advise him about the benefits or hazards of testifying or refused to abide by Petitioner's own decision.  Instead, Petitioner faults counsel for the mere fact that Petitioner testified, and was thus subject to cross-examination.  However, Petitioner cannot claim that trial counsel was ineffective for executing his duty as counsel to accept the choice that was solely Petitioner's to make. *Brown*, 124 F.3d at 78 ("the decision whether to testify belongs to the defendant and *may not be made for him* by defense counsel.") (emphasis added).  In sum, because trial counsel's conduct in calling Petitioner as a witness did not fall below an objective standard of reasonableness and was instead what was constitutionally required under these facts, Petitioner's ineffective assistance claim is without force.

### ii.    Failure to Object During Cross-Examination of Petitioner

Petitioner next argues that "during [the People's] cross-examination of [Petitioner,] counsel utterly failed to offer [Petitioner] any sort of support because counsel failed to object to obviously cumulative and improperly formed questions."  Pet. at 16.  In support of this claim, Petitioner refers to a portion of the People's cross-examination of him where the A.D.A. asked a series of questions eliciting information about what Petitioner remembered during the time leading up to the assault.  *See* T. 554-56.

During the cited portion of Petitioner's testimony, the People asked Petitioner how he was handled by police officers and how this made him feel.  T. 554.  The A.D.A. next inquired whether Petitioner remembered that both a local and state police officer had been present, whether he remembered being transferred from one officer's custody

to another's, and whether he remembered being taken from jail to St. Mary's Hospital. T. 554. The A.D.A. next sought confirmation of Petitioner's testimony elicited on direct examination that Petitioner did not know why he had been brought to the hospital, as he felt fine at the time, and just wanted to return home. T. 555. The People then asked Petitioner: whether he remembered that bail had been posted for him; whether he remembered the amount of the bail; whether he remembered what floor he was assigned to at the hospital; whether he remembered being escorted to that floor by security guards; whether he remembered being asked questions by a nurse; and whether he remembered that nurse as an individual who had previously testified at trial. T. 555-56. The People asked Petitioner if he "still . . . fe[lt] fine" and when Petitioner agreed, asked whether Petitioner did what he was told to do but "didn't feel [like he] needed to be at the hospital[.]" T. 556. Finally, the A.D.A. asked whether Petitioner remembered being given clothes and a towel, taking a shower, and going to sleep. T. 556.

Petitioner does explain which question(s) he believes trial counsel should have objected to; why the questions were not proper; or, significantly, *how he was prejudiced* by counsel's failure to object. "[C]laim[s] of ineffective assistance must contain specific factual contentions regarding how counsel was ineffective." *Kimbrough*, 949 F. Supp. 2d at 355. Petitioner's failure to identify a meritorious objection trial counsel failed to make, resulting in prejudice to his defense, is fatal to this ineffective assistance claim. *See Wolfson v. United States*, 907 F. Supp. 2d 418, 423 (S.D.N.Y. 2012) (holding that the petitioner's ineffective assistance of counsel claim was "without merit because, while the petitioner claim[ed] that his counsel should have objected more during trial, he d[id]

not explain what specific objections should have been made, nor how, because the objections were not made, he was prejudiced in any way."); *Prelaj v. United States*, No. 1:16-CR-0055, 2020 WL 3884443, at *6-7 (S.D.N.Y. July 9, 2020) (denying the petitioner's claim "that Counsel was ineffective for failing to object to facts in the PSR" where the petitioner "fail[ed] to identify any specific facts in the PSR to which Counsel should have objected" holding "[the petitioner]'s ineffective assistance claim fails based on his conclusory allegation of failure to object to nebulous 'inaccurate facts' in the PSR.").

### iii.    Failure to Object to Statements Made by Dr. Osuma

Petitioner also alleges that trial counsel provided ineffective assistance by failing to object to "hearsay statements made by Dr. Osuma[.]"  Pet. at 15 ("The hearsay statements made by Dr. Osuma, a person who did not testify at trial, were permitted into evidence without objection. That the testimony of this hearsay came from the defense expert, Dr. Jin[,] demonstrates even further counsel's incompetence in failing to properly prepare his witness.").  Petitioner argues, "[t]he portion of Dr. Osama's report which related to his diagnosis of [Petitioner] after the commission of the crime was testimonial in nature, and should never have been permitted into evidence when Dr. Osama was not present to be cross-examined."  Pet. at 16.  Petitioner further contends that "[e]ven if the People were to argue that this evidence was not testimonial in nature, and therefore admissible as a business record, counsel's failure to even note this issue is further evidence of counsel's lack of knowledge of basic evidentiary law."  Pet. at 16.

As an initial matter, Dr. Osuma's report was not admitted into evidence. Petitioner's hospital records, presumably including Dr. Osuma's report, were marked for

identification prior to the start of Petitioner's case, but were not admitted at that time.  T. 497-98.  Dr. Jin subsequently used the records to refresh his recollection during the People's cross examination of him, T. 635, and the defense's redirect examination, T. 668-71, but neither the People nor defense counsel offered the records for admission.[16] Accordingly, to the extent Petitioner's ineffective assistance claim relies on defense counsel's failure to preclude the *report* from being admitted into evidence, the claim necessarily fails.  However, the defense expert, Dr. Jin, discussed some of the details contained in Dr. Osuma's report in the following portions of his testimony.

During Dr. Jin's direct examination, defense counsel asked whether the expert determined a diagnosis for Petitioner, and Dr. Jin explained that based on his interview of Petitioner and review of hospital records, he arrived at a diagnosis which "was consistent with [that of] the hospital psychiatrist" Dr. Osuma.  T. 598-99.  Dr. Jin explained that his diagnosis of "brief psychosis" was consistent with the initial diagnosis of the psychiatrist who evaluated Petitioner prior to the alleged assaults.  T. 599. Defense counsel elicited additional testimony in support of Petitioner's affirmative defense by having Dr. Jin explain that it is important for a patient experiencing psychosis to take medication because they suffer from compromised judgment and insight.  T. 603-04 (explaining that Petitioner was a "potential threat to himself or to others. He's hallucinating. He's delusional. So in this case medication, antipsychotic

---

[16] *See, e.g.*, T. 634-35.  *See also* T. 670-71.
> [Petitioner's Attorney]: Okay. So, Dr. Jin, staying with People's Exhibit marked 19 for identification, would you please turn over to page 44?
> [Assistant District Attorney]: Judge, I would object. These aren't in evidence at this time. The Defendant is allowed to refer to them to refresh his recollection but not read from the document.
> The Court: Sustained. [Sic] go ahead and ask your question, and then if the Doctor needs to refer to it that's fine.

medication is very important to help him calm down . . . ."). Dr. Jin also explained it "is very unusual" to change an initial diagnosis. T. 622.

The A.D.A. also referred to Dr. Osuma's reports during the People's cross-examination of Dr. Jin. T. 631-44. Dr. Jin testified that after an initial evaluation of Petitioner, Dr. Osuma did not develop a definitive diagnosis, but did prescribe antipsychotic medication. T. 639-40. The People inquired about what symptoms Dr. Osuma reported Petitioner as having experienced, and Dr. Jin explained that Dr. Osuma found that Petitioner presented with "disorganized behavior, poor judgment, [and] poor insight" but did not mention delusions in the report. T. 642. After discussing Dr. Jin's own report of Petitioner's condition, the People inquired about Dr. Osuma's discharge summary, which had been drafted after the assaults. T. 648-50. Dr. Jin confirmed that Dr. Osuma changed his diagnosis of Petitioner to include anti-social personality disorder. T. 648-49.

On re-direct examination, Dr. Jin repeated his conclusion that, "[b]ased on [his] interview [of Petitioner] and hospital records including Dr. Osuma's own diagnosis, initial impressions[,] and impression at the time of second evaluation, all the evidence suggests that [Petitioner] was having psychosis at the time of hospitalization . . . ." T. 671. In an apparent effort to bolster Dr. Jin's conclusion that psychosis was the proper diagnosis for Petitioner's symptoms, defense counsel asked, "would a psychiatrist prescribe antipsychotic medication without arriving at a conclusion that the patient is indeed psychotic?" and Dr. Jin explained that antipsychotic medication is prescribed when there is "enough evidence suggesting that the patient is psychotic." T. 672-73.

As previously explained, the Appellate Division found that "[n]othing in defense counsel's examination of [Dr. Jin] . . . reflected a lack of preparation as opposed to valid strategy[.]"  *Wu*, 161 A.D.3d at 1397 (citation omitted).  On habeas review, "decisions such as when to object and on what grounds are primarily matters of 'trial strategy and tactics,' . . . and thus are 'virtually unchallengeable' absent exceptional grounds for doing so."  *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) (quoting *Brown v. Artuz*, 124 F.3d 73, 77 (2d Cir. 1997); *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004)) (additional citations omitted).  Therefore, courts in this Circuit have consistently denied ineffective assistance claims where counsel's failure to object to hearsay evidence could be deemed the result of valid trial strategy.  *See, e.g., Singleton v. Davis*, 308 F. App'x. 560, 562 (2d Cir. 2009) (summary order) (denying the petitioner's ineffective assistance claim finding "counsel's failure to object to the admission of second-hand accounts of the offense–his decision to elicit hearsay in at least one instance–was part of a strategy . . . . "); *Freeman v. Burge*, No. 2:05-CV-1585, 2009 WL 1468464, at *12 (E.D.N.Y. May 22, 2009) (holding "even assuming . . . the testimony  . . . constituted inadmiss[i]ble hearsay, the conduct of defense counsel in failing to object to the admission of these statements during trial, taken individually or cumulatively, does not rise to the level of constitutionally ineffective assistance of counsel" because "trial counsel's alleged failure to object may be considered a part of a sound defense strategy"); *Burgess v. Sheahan*, No. 1:16-CV-1461, 2017 WL 9325814, at *13 (S.D.N.Y. Sept. 8, 2017), *report and recommendation adopted*, 2018 WL 2186409 (S.D.N.Y. May 11, 2018) (noting, "even if [the] testimony [at issue] did violate the Confrontation Clause, it was objectively reasonable for counsel to permit the

testimony because it tended to corroborate the defense theory").[17]  Further, the Second Circuit has explained that "in case after case, we have declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised." *Tippins v. Walker*, 77 F.3d 682, 686 (2d Cir. 1996) (citing, *inter alia*, *Cuevas v. Henderson*, 801 F.2d 586, 590 (2d Cir.1986) (denying ineffective assistance claim based on counsel's questioning which "opened the door" to damaging evidence), *cert. denied*, 480 U.S. 908 (1987)).

Here, Petitioner has failed to rebut the presumption that trial counsel's conduct in allowing Dr. Jin to discuss Dr. Osuma's report during his testimony constituted valid trial strategy.  As discussed above concerning Petitioner's argument that counsel improperly allowed Dr. Jin to "open the door" to the details Dr. Osuma's evaluation, it was necessary for Dr. Jin to rely on third-party reports regarding the symptoms Petitioner experienced prior to the alleged assaults in order to prove the affirmative defense, i.e., to demonstrate that Petitioner was experiencing a mental disease or defect *at the time* the incident occurred.  Moreover, by discussing Dr. Osuma's initial report attributing Petitioner's condition to psychosis, Dr. Jin was able to provide additional support for his identical conclusion, thus supporting Petitioner's affirmative defense.

Although the defense expert's testimony also revealed that Dr. Osuma later diagnosed Petitioner with anti-social personality disorder, Dr. Jin also offered testimony explaining why a diagnosis of "psychosis" was more fitting.  Dr. Jin testified that "the

---

[17] *See also United States v. Miguel*, 122 F.3d 1058 (2d Cir. 1997) (denying Petitioner's ineffective assistance claim that trial counsel "failed to make appropriate objections during the proceedings, including failure to object to the [hearsay] testimony of a customs agent" concluding that "even if [the] statement [at issue] was hearsay, counsel's conduct was not unreasonable under the circumstances and is not a ground for reversal now. [Because] '[a]ctions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance.'") (quoting *United States v. Javino*, 960 F.2d 1137, 1145 (2d Cir. 1992)).

anti-social personality disorder Dr. Osuma would like to give retroactively does not . . .

meet the criteria because [Petitioner] had no criminal record prior to" the alleged

assaults and anti-social personality disorder is a diagnosis more fitting for a patient who

exhibits a history of "repeatedly violat[ing] other people's rights and [a] disregard [for]

what's right or what's wrong" of which Petitioner had "no indication[.]"  T. 661.  Dr. Jin

was also able to discredit the conclusion which was inconsistent with the defense theory

as he explained initial impressions are often accurate because the person is

experiencing a more "acute condition[,]" stated it is "very unusual" to change a

diagnosis, and that psychiatrists do not prescribe antipsychotic medication, like Dr.

Osuma did here, unless there was evidence that the patient was indeed experiencing

psychosis.  T. 622, 672-73.

　　　　In sum, although defense counsel's decision not to object to Dr. Jin's references

to Petitioner's hospital records– including Dr. Osuma's observations and conclusions –

may have seemed risky, unorthodox, or downright ill-advised, it was not ineffective

assistance.  Therefore, it cannot be said that the Appellate Division's conclusion that

defense counsel's examination of Dr. Jin reflected "valid strategy" involved an

unreasonable application of *Strickland*. *See Wu*, 161 A.D.3d at 1397.

　　　　　　**iv.　　Hearsay Objection to Statements Made by Petitioner**

　　　　Petitioner next identifies that "[c]ounsel objected to evidence offered by the

People of statements made by [Petitioner] as hearsay."  Pet. at 16.  Petitioner cites to a

portion of the transcript recording the People's direct examination of Carl Rivenburg.

*See* Pet. at 16.

During this portion of Mr. Rivenburg's testimony, the witness explained that when

he arrived at the mental health unit, his goal was "[t]o stop the attack"; therefore, Mr.

Rivenburg and other St. Mary's Hospital employees grabbed Petitioner's arms and put

him down on the floor.  T. 421-22.  The prosecutor asked, "as you and these two other

gentlemen placed hands on [Petitioner] was he saying anything at that time?" and the

witness responded Petitioner "was just struggling trying to get away from us until we got

him on the ground. When we got him on the ground he told us to get the fuck off of him,

and he wanted to call his wife, and that he couldn't breathe."  T. 422.  Rivenburg

confirmed Petitioner made these statements in English and estimated that the

employees held Petitioner on the ground for at least fifteen to twenty minutes while they

waited for the Amsterdam Police Department to arrive.  T. 422.  The A.D.A. asked if

Petitioner said anything else while they waited for the police, and Mr. Rivenburg

answered "[Petitioner] continued to struggle and yell, '[g]et the fuck off of me. Call my

wife.'"  T. 422.  Defense counsel objected on the basis of hearsay, but County Court

overruled the objection; therefore, the People repeated the question and the witness

repeated his answer.  T. 422-23.

Petitioner does not explain how counsel's unsuccessful attempt to object to this

question either fell below an objective standard of reasonableness or prejudiced his

defense.  Whether Petitioner believes counsel should have objected to the testimony on

another basis or refrained from objecting altogether,"[t]he Sixth Amendment guarantees

reasonable competence, not perfect advocacy judged with the benefit of hindsight."

*Yarborough*, 540 U.S. at 8.  Accordingly, the undersigned is unable to conclude the

Appellate Division unreasonably concluded Petitioner received meaningful

representation despite trial counsel's unsuccessful objection.  *See Dodakian v. United States*, No. 1:14-CV-1188, 2015 WL 11144511, at *17 (S.D.N.Y. Aug. 14, 2015), *report and recommendation adopted*, 2016 WL 3866581 (S.D.N.Y. July 12, 2016) ("Even if the grounds [counsel] objected on were later deemed to have no merit . . . and even if his objection *might* have been successful if he had made it on other grounds, this one unsuccessful objection did not prejudice [Petitioner] given the weight of the totality of the evidence.") (emphasis in original).

### v.    Offer of Medical Records Without a Witness and Foundation

In further support of his ineffective assistance claim, Petitioner argues "[c]ounsel offered medical records without a witness nor any foundation . . . [Which] prompted [County] Court to offer to research whether a hearsay exception existed for these records."  Pet. at 16 (citations omitted).  Prior to presenting evidence, outside of the presence of the jury, trial counsel offered "Defense Exhibit B . . . [Petitioner's] medical records from St. Mary's," but the People responded– and County Court agreed –that such records could be introduced only with foundation provided by a relevant witness.  T. 497.  Accordingly, the records were not admitted at that time.  T. 498.  As explained above, Petitioner's medical records from St. Mary's Hospital were never admitted into evidence at trial.[18]

Petitioner has not explained how trial counsel's unsuccessful offer to admit records into evidence, outside of the presence of the jury, constituted ineffective assistance.  Indeed, in another portion of the instant petition, Petitioner faults trial

---

[18] Petitioner's hospital records *were* marked for identification and Dr. Jin used the records to *refresh his recollection* during the People's cross examination– *see* T. 635 –and the defense's redirect examination– *see* T. 668, –however, neither party admitted the hospital records into evidence.

counsel for having "opened the door" to questions about Dr. Osuma's statements contained in the previously-offered hospital records.  *See* Pet. at 13.

To the extent Petitioner wishes to argue that counsel's performance was deficient in failing to have the records admitted– he has failed to demonstrate that had the records been admitted into evidence, there is a reasonable probability that the result of the proceedings would have been different.  *See, e.g., United States v. Choudhry*, 330 F. Supp. 3d 815, 850 (E.D.N.Y. 2018), *affirmed*, 813 F. App'x 4 (2d Cir. 2020) (summary order) ("Even assuming the[ records'] admissibility . . . Petitioner has failed to establish a reasonable probability that the result of the trial would have been different had they been admitted.").  Indeed, Petitioner has failed to even allege that the unadmitted records contained any information which would have either undermined the People's case against him or aided in his defense.  *See* Pet. at 16.  Alternatively, if Petitioner's claim is that the hospital records never should have been offered into evidence– he remains unable to establish prejudice because the records were never admitted.

In sum, even if trial counsel's offer of Petitioner's hospital records had been wholly devoid of any purpose, counsel's actions did not prejudice Petitioner's defense. Accordingly, Petitioner has failed to establish that the Appellate Division's conclusion that he received meaningful representation was unreasonable.

### vi.    Testimony about Petitioner's Possession and Use of Cocaine

Next, Petitioner argues trial counsel rendered ineffective assistance by failing to preclude mention of Petitioner's use and possession of cocaine.  Petitioner avers:

> Counsel's failure to object when the People's very first witness mentioned that [Petitioner] possessed cocaine and cash at the time of his arrest added yet another element of prejudice to [Petitioner]'s case . . . This was compounded when Counsel

> failed to object when [Petitioner] was cross-examined by the
> People regarding his cocaine use . . . The proper course
> would have been to file a motion *in limine* to preclude
> reference to any such references, or to request a pretrial
> ruling.

Pet. at 17 (citations omitted).  Petitioner was not charged with any offense related to the

use or possession of any controlled substance in this case.  *See* Pet. at 17.[19]  Petitioner

contends that "[w]hen defense counsel place[d] incriminating evidence before a jury,

which tends to show nothing other than [Petitioner]'s criminal propensities, counsel did

not act effectively."  Pet. at 17.

It is apparent from the State Court Record that while at St. Mary's Hospital, a

Montgomery County Sheriff's officer searched Petitioner's pocket and allegedly

discovered a plastic bag containing "a white powdery substance identified by the officer

as 'crack cocaine.'"  SR 37.  In a pre-trial motion, defense counsel moved to suppress

both this physical evidence, which had been seized by the officer, and Petitioner's

statements, admitting to possession of a controlled substance.  SR 36-39.  In response,

the People affirmed: (1) the indictment contained no counts relating to the possession of

an illegal substance, and (2) the People did not intend to offer any of Petitioner's

statements other than those which were made during the alleged assaults.  SR 42.

Based on the People's response, County Court denied Petitioner's motion to suppress

the physical evidence and statements.  SR 47-51.

---

[19] Petitioner avers "[e]ven if [Petitioner] had been charged with a controlled substance offense, the joinder
of such charges would have been improper pursuant to New York law, something with which counsel
should have been familiar."  Pet. at 17.  Because, as Petitioner identifies, he "had never been charged
with any controlled substance offense[,]" trial counsel's knowledge of New York's joinder rules, or lack
thereof, could not serve as a basis for habeas relief.

At trial, the People first called Vonny Surjoto-Lawrence, who testified that she conducted an admission for Petitioner at St. Mary's Hospital.  T. 241-43.

> [The People]:       So on April 20, 2016[,] when you conducted [Petitioner]'s admission[,] what questions did you ask him at that time, if any?
> [Ms. Surjoto-Lawrence]:    Like what brought him come over here from Rome to Town Palatine.
> [The People]:       Did he reply to that question?
> [Ms. Surjoto-Lawrence]:    He was say -- he was saying like basically  like somebody following him, but from the report I know that he carried $700 worth of cocaine and cash money, a lot amount of cash money.
> [The People]:       Did he speak to you about that?
> [Ms. Surjoto-Lawrence]:    He told me that -- he said he carried cocaine. He did admitted that he carried cocaine.

T. 243.  Ms. Surjoto-Lawrence then turned to questions about Petitioner's health history and did not mention any additional details about Petitioner's alleged possession of cocaine.  T. 243-97.  On cross-examination, defense counsel asked the witness about the patient care inquiry form she completed which indicated Petitioner's treatment should involve education "for anxiety management, anger management, medication, substance abuse, social skill development and symptom management."  T. 304-05. Concerning the cocaine, Ms. Surjoto-Lawrence reported on direct examination, defense counsel asked if Petitioner had been subjected to a drug test, and the witness answered "[Petitioner's] urine drug screen was negative," explaining to the jury that the negative result meant "[t]here [were] no drugs like cocaine, marijuana, amphetamine, b]enzodiazepine [or] some other drugs in his urine in his body."  T. 309.  On re-direct examination, Ms. Surjoto-Lawrence clarified the drug testing process was completed by the emergency room.  T. 329-30.  The People moved to strike from the record the

witness' answers relating to the drug test results, but County Court overruled the

People's objection.  T. 330.

The defense first called Petitioner to testify. Petitioner testified that when he woke

up at the hospital, he was in pain, the floor appeared to be moving, and "[i]t looked like

there [were] people coming out of the wall."  T. 531.  Petitioner explained that in

"Chinese Daoism or Buddhism we believe . . . there are like spirit[s] or ghosts after

[people] die, and [people often die in hospitals.]"  T. 532.  Counsel asked Petitioner if he

practiced Daoism and Petitioner answered, "I'm practicing what -- do you call it -- inner

KungFu, inner exercise."  T. 532.  On cross-examination, the A.D.A. asked Petitioner a

series of questions about his memory of his hospitalization.  T. 552-57.  The People

asked Petitioner if he had reported his pain to the nurses, and Petitioner stated he did

not because he did not feel that they were reliable.  T. 557.  Next, the prosecutor asked:

> [The People]:Do you remember being prescribed any medication while you were in the hospital?
> [Petitioner]:   They wanted me -- yes. They wanted me to take some medicine, but I refused.
> [The People]:What about prior to coming into the hospital? Had you taken any medication or substances?
> [Petitioner]:   No.
> [The People]:You hadn't taken any cocaine?
> [Petitioner]:   No.

T. 558.  Defense counsel objected that the information was not in the record, but County

Court overruled the objection.  T. 558.  The People continued:

> [The People]:Well, you did tell the staff at St. Mary's Hospital that you used cocaine. Isn't that true, Mr. Wu?
> [Petitioner]:   No.
> [The People]:You didn't tell Dr. Osuma that?
> [Petitioner]:   No.
> [The People]:You didn't tell Vonny Lawrence that at your admission?

> [Petitioner]:   She asked me have I ever used cocaine. I said yes, I did.
> [The People]:Okay. And when had you used cocaine? Do you remember?
> [Petitioner]:   Usually I don't use them.
> [The People]:How long has it been since you've used cocaine?
> [Petitioner]:   I use the cocaine to practice my inner exercise. It's not for entertainment or anything.
> [The People]:Okay. So prior to your admission to the hospital on April 19, 2016, when's the last time you had used cocaine?
> [Petitioner]:   Many days ago.
> [The People]:And when you say many, would that have been within the week prior?
> [Petitioner]:   I don't know what you say how many days, but my situation is I don't use cocaine, you know, anyway so easy, no, only in certain situations.

T. 558-59.  Following Petitioner's testimony, defense counsel called Dr. Jin to testify and offer an opinion as an expert in psychology.

Dr. Jin opined that Petitioner's symptoms were consistent with a diagnosis of psychosis. Dr. Jin explained that he arrived at this diagnosis after eliminating other possible diagnoses, "such as substance abuse psychosis such as cocaine psychosis." T. 600.  The expert testified "because the hospital didn't f[i]nd in [Petitioner's] blood any cocaine or any substance use . . . [substance abuse psychosis] was ruled out . . . . "  *Id.* Defense counsel also asked the expert about "triggering factors that would cause a patient to have episodes of psychosis[.]"  T. 604.  Dr. Jin testified that Petitioner exhibited several predisposition factors including "borderline thinking and behavior[.]"  T. 604-05.  Dr. Jin explained Petitioner had studied Daoism and Buddhism with a master who had passed away six years ago, that materials from the master discussed the use of a plant to cause hallucinations, and that Petitioner told Dr. Jin that he "thought

68

cocaine would do the same thing."  T. 605-06.  Dr. Jin testified that because of

Petitioner's risk factors, he was "more likely to have psychosis under stress."  T. 606-07.

During the People's cross-examination of the defense expert, Dr. Jin confirmed

he diagnosed Petitioner with "brief psychotic disorder with marked stressor not present"

and also listed "adjustment disorder with disturbance emotion and conduct."  T. 659.

Dr. Jin explained he ruled out a diagnosis of schizophrenia because the duration of

Petitioner's symptoms did not match the criteria and also ruled out cocaine-induced

psychotic disorder because the hospital's urine test did not detect cocaine in Petitioner's

body.  T. 659.  The People asked whether Dr. Jin ruled out stimulant cocaine use

disorder, and the expert stated he did, because while Petitioner did indicate that he had

used cocaine, there was no corroborating evidence of cocaine use at the time of the

incident.  T. 660.

Defense counsel did not mention Petitioner's alleged possession or use of

cocaine or possession of cash in his summation.  *See* T. 736-44.  The People briefly

mentioned cocaine use on summation, stating:

> I'd like you to consider [Petitioner's] credibility as well. In
> thinking about him I want you to think specifically about his
> ability to recall the events and any hostility or attitude during
> his testimony, and first, I guess, as a side note we recall the
> [Petitioner]'s testimony how he admitted to using cocaine for
> religious purposes over the past year. But [Petitioner]
> remembered everything, everything from the minute he left his
> house on April 19, 2016[,] all the way up and through his
> admissions into the hospital.

T. 758-59.  The People's summation did not include any mention of cash allegedly on

Petitioner's person at the time of his hospitalization.  *See* T. 744-62.

Petitioner has failed to demonstrate that there is no reasonable argument that defense counsel satisfied *Strickland*'s deferential standard with respect to counsel's decision to allow such testimony to be presented.  *See Harrington*, 562 U.S. at 105. "New York courts frequently admit evidence of prior bad acts, including uncharged crimes, 'as background material' and to 'complete the narrative of events.'"  *Rodriguez v. Superintendent, Collins Corr. Facility*, 549 F. Supp. 2d 226, 244 (N.D.N.Y. 2008) (citing *Charles v. Fischer*, 516 F.Supp.2d 210, 217 (E.D.N.Y. 2007)); *see also Howard v. Potter*, No. 9:06-CV-0982 (GTS/GHL), 2009 WL 3259080, at *6 (N.D.N.Y. Oct. 7, 2009) ("Under New York and federal law, evidence of prior crimes or bad acts is admissible where it is relevant to an issue other than the defendant's propensity to commit the crime with which he is charged.").  It is apparent from the record that allowing the testimony could be the result of a strategic decision to aid in the proof of Petitioner's affirmative defense.

As explained above, defense counsel sought to prove that Petitioner lacked criminal responsibility by reason of mental disease or defect because, at the time of the charged assaults, Petitioner suffered from psychosis.  The defense expert explained such a diagnosis is appropriate when a patient exhibits symptoms of either "[d]elusion, hallucination, disorganized speech[,] and[/or] disorganized behavior" and that a person suffering from even a brief psychosis could experience severe "poor judgments [and] poor cognitive functioning."  T. 599-601.  Defense counsel could have reasonably decided the testimony concerning Petitioner's alleged possession and use of cocaine would provide evidence of disorganized behavior and poor judgment thus supporting

the conclusion that Petitioner was suffering from a brief psychosis at the time of the alleged assaults.

During his direct examination of Petitioner, defense counsel highlighted Petitioner's seemingly illogical decision to ask the residents he encountered, after his car broke down, to call 911 so the police could summon a taxi for Petitioner.  T. 503-05.  Petitioner's decision to ask the individual to call 911 rather than just obtaining a taxi directly could demonstrate disorganized behavior and poor judgment.  But to make such a request when Petitioner allegedly possessed cocaine and large sums of cash could illustrate more significantly impaired judgment.  Further, as Dr. Jin explained, Petitioner's decision to use cocaine to study his religion and communicate with the universe demonstrated borderline thinking and behavior– predisposition factors for the psychosis Petitioner sought to prove he experienced at the time of the assaults.  T. 605-06.

Finally, it would not have been unreasonable for defense counsel to conclude that the value of the testimony about Petitioner's possession and use of cocaine outweighed the risk that the jury would conclude Petitioner had a general propensity for criminality.  The alleged use of cocaine for religious purposes is dissimilar to the assault in the second degree charges Petitioner faced.  Moreover, Petitioner testified that he had not used cocaine for many days prior to the assaults, a claim supported by Ms. Surjoto-Lawrence's testimony that a drug screen test revealed no drugs in Petitioner's body at the time of his hospital admission.  T. 558-59, 309.

In sum, because defense counsel's conduct in allowing the jury to hear testimony that Petitioner had used cocaine and allegedly possessed sums of cash and cocaine at

the time of his hospitalization could be attributed to defense strategy, it cannot constitute ineffective assistance. *See Jones v. Annucci*, 124 F. Supp. 3d 103, 118-19 (N.D.N.Y. 2015) (rejecting Petitioner's claim that "trial counsel was ineffective because he . . . [*inter alia*,] failed to object to the introduction of evidence of uncharged crimes" finding Petitioner "fail[ed] to show that trial counsel's alleged omissions constituted deficient performance or that [Petitioner] was prejudiced by them."). Even assuming defense counsel's failure to object to any of the above-listed mentions of Petitioner's alleged possession and use of cocaine fell below an objective standard of reasonableness, Petitioner has not demonstrated that there is a reasonable probability that, but for counsel's failure to object, he would not have been convicted of two counts of assault. Therefore, he is not entitled to habeas relief on this claim.

### vii.    Failure to File Post-Trial Motions

In further support of his ineffective assistance claim, Petitioner asserts "[d]efense counsel filed no post-trial motions." Pet. at 17. As an initial matter, Petitioner has not explained what post-trial motion(s) counsel should have filed. The undersigned is unable to conclude counsel's performance was deficient based on counsel's failure to file an unidentified motion.

Following sentencing, Petitioner retained new counsel for his direct appeal. In addition to the ineffective assistance of counsel claim(s), Petitioner challenged his judgment of conviction on the theory that County Court imposed an excessive sentence in retaliation for Petitioner's decision to proceed to trial. *See generally*, SR 59-86, Petitioner's Appellate Division Brief. However, even construing the present claim as

arguing that trial counsel was ineffective for failing to file a post-trial motion challenging County Court's imposition of sentence, Petitioner would not be entitled to relief.

Although the Third Department observed that trial counsel failed to preserve Petitioner's vindictive sentencing claim for review,[20] as explained below, Petitioner's vindictive sentencing claim is meritless.  Therefore, trial counsel was not ineffective for failing to properly preserve the vindictive sentencing claim.  *See Rosario v. Colvin*, No. 9:18-CV-0988 (LEK), 2020 WL 360882, at *14 (N.D.N.Y. Jan. 22, 2020) ("Petitioner contends that trial counsel was ineffective for failing to preserve his vindictive sentence and duplicity claims for appellate review . . . Petitioner's vindictive sentence and duplicity claims are meritless. Thus, trial counsel's failure to preserve these claims cannot constitute constitutionally ineffective representation."); *see also Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) ("The failure to include a meritless argument does not fall outside the 'wide range of professionally competent assistance[.]'") (citations omitted); *Wright v. Lamanna*, No. 9:18-CV-1063 (MAD/TWD), 2021 WL 5095292, at *18 (N.D.N.Y. Apr. 21, 2021), *report and recommendation adopted*, 2021 WL 4452094 (N.D.N.Y. Sept. 29, 2021) ("Counsel cannot now be deemed ineffective for failing to make an argument or objection that stood little chance of success.").

In sum, because Petitioner has failed to prove that trial counsel's performance fell below an "objective standard of reasonableness" by failing to preserve a vindictive sentencing claim or failing to file some other post-trial motion, the undersigned is unable to conclude the Appellate Division's application of *Strickland* was unreasonable.

### viii.    Failure to Remind Sentencing Court of Prior Plea Offers

---

[20] *See Wu*, 161 A.D.3d at 1397-98.

Finally, Petitioner argues, "[c]ounsel's failure to remind the sentencing court of its previous lower sentencing offers during plea negotiations also indicates counsel's unfamiliarity with criminal defense and certainly could be considered a major fact in the receipt of the sentence that the Petitioner received." Pet. at 17. Petitioner avers:

> Competent counsel would have reminded [County] Court of the promised lower sentences previously offered during plea negotiations, offers certainly made after due consideration by the People of the seriousness of the crime, [Petitioner]'s criminal history, community circumstances, and assertion of possible defenses. Instead counsel tried to continue to sell the court on the insanity defense.

Pet. at 17-18. Petitioner is correct that counsel's statement on Petitioner's behalf at the sentencing hearing omitted mention of the sentence(s) contained in plea agreements offered to Petitioner prior to trial. *See* T. 858-59; 863-64. Again, however, Petitioner is unable to demonstrate a reasonable probability that counsel's alleged errors had any effect on the outcome of the proceeding.

As discussed in great detail below, County Court announced it did, in fact, consider "the range of plea agreements that were offered by the People which included local time and lower prison sentences" at sentencing. T. 865. Petitioner, in the instant petition, acknowledges County Court's consideration of the sentences contained in rejected plea offers, suggesting that County Court vindictively imposed a longer sentence to punish Petitioner for rejecting those offers and proceeding to trial. *See* Pet. at 19 ("The sentencing court stated that it was considering[, *inter alia*,] the prior plea offers . . . in fashioning the sentence of 5 years. These factors demonstrate that [Petitioner] was indeed being punished for exercising his right to proceed to trial . . . . ").

Because it is clear from the record that County Court was not only aware of more lenient sentences previously offered to Petitioner, but considered those lesser sentences when imposing Petitioner's sentence after trial, Petitioner is unable to demonstrate prejudice resulting from counsel's failure to remind County Court of those lesser sentences.  Accordingly, the undersigned is unable to conclude the Third Department's determination that Petitioner was afforded meaningful representation was unreasonable.  *See, e.g., Yapor v. Mazzuca*, No. 1:04-CV-7966, 2005 WL 894918, at *27 (S.D.N.Y. Apr. 19, 2005), *report and recommendation adopted*, 2005 WL 1845089 (S.D.N.Y. Aug. 3, 2005) ("Even if defense counsel's performance was deficient at sentencing, [Petitioner] has not shown prejudice . . . [Therefore, Petitioner] has failed to make a showing of ineffective assistance of counsel and certainly has not shown that the First Department's decision was an unreasonable application of *Strickland*.").

### 3.  Cumulative Effect

Petitioner alternatively argues that, "[e]ven if one of these errors alone would not create a violation of [Petitioner]'s right to effective assistance of counsel, the cumulative effect of them does."  Pet. at 18.  "In limited circumstances, habeas relief may be justified based on the cumulative effect of errors that, standing alone, would not warrant the granting of a new trial."  *Major v. Lamanna*, No. 9:18-CV-0418 (DNH/TWD), 2021 WL 4267851, at *31 (N.D.N.Y. Sept. 3, 2021), *report and recommendation adopted*, 2021 WL 4263148 (N.D.N.Y. Sept. 20, 2021), *vacated* (Nov. 16, 2021), and *report and recommendation adopted*, 2022 WL 408819 (N.D.N.Y. Feb. 10, 2022) (citing *United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999)).  "The cumulative-error rule . . . can only come into play after errors have been discovered; if no one error requires

reversal, the whole body of error is to be assessed for prejudicial effect." *Sanders v. Sullivan*, 701 F. Supp. 1008, 1013 (S.D.N.Y. 1988). Respondent avers, "[n]one of [Petitioner's] claimed errors regarding counsel's representation have merit . . . [therefore,] they cannot be aggregated to form the basis for relief." Dkt. No. 6-1 at 23.

"'[I]mplicit in [a cumulative error] claim is, first, that the alleged individual errors a petitioner seeks to aggregate are actually *errors*.'" *Major*, 2021 WL 4267851, at *31 (collecting cases) (quoting *Joyner v. Miller*, No. 1:01-CV-2157, 2002 WL 1023141, at *13 (S.D.N.Y. Jan. 7, 2002) (emphasis in original)). In other words, "the accumulation of non-errors does not warrant a new trial." *Lumpkin*, 192 F.3d at 290. In the instant petition, several of the examples Petitioner highlights purporting to demonstrate defense counsel's deficiencies are not actually errors. Petitioner has not demonstrated that defense counsel committed an error: in advising Petitioner on plea offers;[21] in preparing the defense expert, Dr. Jin;[22] by "opening the door" to testimony about the contents of Dr. Osuma's report;[23] by allowing the "destruction" of the defense expert's credibility on cross-examination;[24] in delivering the defense summation;[25] by calling Petitioner to testify as a witness;[26] by failing to offer additional objections during the People's cross-examination of Petitioner;[27] by failing to object to Dr. Jin's use of statements contained in Dr. Osuma's report;[28] by objecting to Petitioner's out-of-court statements as hearsay;[29] in failing to preclude mention of Petitioner's history of cocaine use and

---

[21] *See* Section (IV)(A)(1)(ii).
[22] *See* Section (IV)(A)(1)(iii).
[23] *See* Section (IV)(A)(1)(iv).
[24] *See* Section (IV)(A)(1)(v).
[25] *See* Section (IV)(A)(1)(vi).
[26] *See* Section (IV)(A)(2)(i).
[27] *See* Section (IV)(A)(2)(ii).
[28] *See* Section (IV)(A)(2)(iii).
[29] *See* Section (IV)(A)(2)(iv).

alleged possession of cash and cocaine at the hospital;[30] or by failing to file any post-trial motions.[31]

Further, as explained above, defense counsel's failure to timely file the notice of defense is a moot point, as County Court permitted Petitioner to present evidence of his claimed mental disease or defect at trial,[32] and counsel's failure to remind County Court of rejected plea offers at sentencing cannot be said to have affected the result of the proceedings because County Court explicitly stated it considered those offers in determining an appropriate sentence.[33] Finally, concerning defense counsel's offer of medical records without a proper witness and foundation, Petitioner has not explained how this alleged error, which occurred outside of the presence of the jury, had any impact on the proceedings against him.[34] In fact, Petitioner later faults counsel for "opening the door" to statements contained in the offered records. *See, e.g.*, Pet. at 15 ("The hearsay statements made by Dr. Osuma, a person who did not testify at trial, were permitted into evidence without objection."). Therefore, it cannot be said that the cumulative effect of these actual errors was "prejudicial that they rendered petitioner's trials fundamentally unfair." *Collins v. Scully*, 878 F. Supp. 452, 460 (E.D.N.Y. 1995) (citing *United States v. Araujo*, 539 F.2d 287, 292 (2d Cir. 1976). Accordingly, Petitioner is not entitled to habeas relief on his ineffective assistance of counsel claims.

**B. Sentencing Claims**

---

[30] *See* Section (IV)(A)(2)(vi).
[31] *See* Section (IV)(A)(2)(vii).
[32] *See* Section (IV)(A)(1)(i).
[33] *See* Section (IV)(A)(2)(viii).
[34] *See* Section (IV)(A)(2)(v).

Petitioner next argues he is entitled to habeas relief because his sentence was "excessive and imposed because [he] exercised his right to proceed to trial." Pet. at 18-20.  Petitioner made an identical claim on direct appeal.  *See* SR 82-85, Petitioner's Appellate Division Brief.  The Third Department held that there were no extraordinary circumstances rendering Petitioner's sentence harsh or excessive and Petitioner's claim that his sentence was imposed in retaliation for demanding a jury trial was not properly preserved for review.  *Wu*, 161 A.D.3d at 1397-98.  Respondent contends habeas relief is not available for Petitioner's claim that the sentence imposed was harsh and excessive, as the imposed sentence was within the range prescribed for the crimes, and Petitioner's claim that his sentence was imposed in retaliation for proceeding to trial is procedurally barred on adequate and independent state law grounds.  Dkt. No. 6-1 at 23-27.  The undersigned agrees.

### 1. Excessive Sentence

Petitioner first argues the sentence County Court imposed was "excessive."  *See generally*, Pet. at 18-20.  County Court sentenced Petitioner to a determinate term of five years' incarceration and two years of post-release supervision for his conviction of the crime of Assault in the Second Degree under count one of the indictment.  T. 866-67.  County Court also sentenced Petitioner to five years' incarceration and two years of post-release supervision for his conviction of the crime of Assault in the Second Degree under count two of the indictment to run concurrently with the sentence imposed on count one.  T. 867.

"No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law."  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992)

78

(citation omitted); *see also Townsend v. Burke*, 334 U.S. 736, 741 (1948) ("The sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus."); *Grimes v. Lempke*, No. 9:10-CV-0068 (GLS/RFT), 2014 WL 1028863, at *3 (N.D.N.Y. Mar. 14, 2014) ("It is well settled that the issue of whether a sentence was overly harsh or excessive is not a proper issue for review in the habeas context unless the sentence was outside of the permissible range provided for by state law.") (citing *White*, 969 F.2d at 1383). Under New York law, "assault in the second degree as defined in [P.L.] section 120.05" is considered "a violent felony offense." P.L. § 70.02(1)(c). "The term of a determinate sentence for a violent felony offense . . . For a class D felony . . . must be at least two years and must not exceed seven years . . . ." *Id*. § 70.02(3)(c). Accordingly, County Court was authorized to impose a determinate prison term of between two and seven years for each assault conviction.

Here, Petitioner's determinate sentences of five years incarceration, followed by two years of post-release supervision, on each second-degree assault count fall within the limits set by the New York State legislature. Therefore, Petitioner's excessive sentence claim provides no grounds for federal habeas relief. *See, e.g., Rodriguez v. Griffin*, No. 9:16-CV-1037, 2018 WL 6505808, at *24 (N.D.N.Y. Dec. 11, 2018) ("[Petitioner]'s . . . sentences . . . even if representing the maximum amount of time permissible . . . fall within the limits set by New York law and therefore petitioner's claim provides no grounds for federal habeas relief.").

### 2.  Vindictive Sentence

Petitioner also contends he "was unconstitutionally penalized for exercising his right to trial by jury." *See* Pet. at 18-20. In his brief to the Appellate Division challenging his judgment of conviction, Petitioner argued, "[t]he only reason that [he] received such an excessive sentence was his decision to proceed to trial" because Petitioner "had no prior criminal record, apologized to his victims, expressed remorse about his conduct, and according to all evidence, including his admission to the psychiatric ward just prior to his commission of the offense, was not acting as the law abiding person he had been throughout his entire life." SR 85. The Third Department held that Petitioner "failed to preserve his contention that the aggregate sentence reflected retaliation for his decision to reject prior plea offers and demand the trial to which he was entitled." *Wu*, 161 A.D.3d at 1397-98 (citing *People v. Hurley*, 75 N.Y.2d 887, 888 (1990); *People v. Hahn*, 159 A.D.3d 1062, 1067 (2018)).

It is well established that a "federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Walker v. Martin*, 562 U.S. 307, 315 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 55 (2009)) (additional citations omitted). "This rule applies whether the state law ground is substantive or procedural." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citation omitted). Moreover, "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990).

In the present case, the Third Department first held that Petitioner failed to properly preserve his sentencing claim. *See Wu*, 161 A.D.3d at 1397-98. The Second Circuit has explained

> New York's preservation rule, codified at N.Y. Crim. P. Law § 470.05(2), "require[s], at the very least, that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error."

*Richardson v. Greene*, 497 F.3d 212, 218 (2d Cir. 2007) (quoting *Garcia v. Lewis*, 188 F.3d 71, 78 (2d Cir. 1999)) (additional citations omitted). Petitioner's sentencing claim contained in the instant petition will be barred from habeas review so long as the Third Department's reliance on the preservation rule was "independent of the federal question and adequate to support the judgment." *See Coleman*, 501 U.S. at 729 (1991).

New York's preservation rule "is a state law ground . . . independent of any federal question . . . ." *Garvey v. Duncan*, 485 F.3d 709, 720 (2d Cir. 2007). Therefore, the Third Department's application of the preservation rule was independent of the federal question presented here. "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'" *Walker*, 562 U.S. at 316 (citation omitted). Courts in this Circuit have consistently deemed New York's preservation rule to be "firmly established and regularly followed." *See, e.g., Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011) (noting "we have held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule.") (collecting cases). Therefore, the Appellate Division's conclusion that Petitioner failed to preserve his vindictive sentencing claim was both independent of the federal question and adequate to support the judgment. *See, e.g., Kanani v. Phillips*,

No. 03-CV-2534, 2004 WL 2296128, at *24 (S.D.N.Y. Oct. 13, 2004), *report and recommendation adopted*, 2005 WL 2431416 (S.D.N.Y. Oct. 3, 2005) (holding that the petitioner's "sentencing claim [wa]s barred from habeas review by an adequate and independent state ground" where the petitioner's counsel failed to "make any objection at sentencing" because "[u]nder New York Law . . . In order to preserve his judicial vindictiveness in sentencing claim for appellate review, [the petitioner] was required to object at the time of his sentence.") (citations omitted).[35]

Because Petitioner's claim was procedurally defaulted, "federal habeas review of the claim[] is barred unless [Petitioner] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Petitioner has not suggested any facts which caused his failure to preserve his federal claim. *See generally*, Pet. at 18-20.[36] Because Petitioner has failed to establish cause, it is not necessary to determine whether he suffered actual prejudice.

---

[35] "Ordinarily, violation of 'firmly established and regularly followed' state rules . . . will be adequate to foreclose [habeas] review of a federal claim." *Lee v. Kemna*, 534 U.S. 362, 376 (2002) (citations omitted). However, the Supreme Court has recognized "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Id.* (citation omitted). Petitioner has not alleged, nor has the undersigned been able to conclude, that the Appellate Division's application of the preservation rule in the instant matter constituted such an "exorbitant application of a generally sound rule." Accordingly, this "limited" exception is not applicable.

[36] The undersigned notes, as explained above, Petitioner has argued trial counsel provided ineffective assistance. However, Petitioner has not argued that trial counsel provided ineffective assistance *by failing to properly preserve Petitioner's vindictive sentencing claim. See generally*, Pet.

> The Court notes that although Petitioner raises an ineffective assistance of counsel claim in his habeas petition, he does not identify his trial counsel's failure to preserve [an argument] . . . as a basis for that claim . . . . Furthermore . . . Petitioner's ineffective assistance of trial counsel claim is without merit, and therefore does not serve as "cause" for a procedural default.

*Wright v. Lamanna*, No. 9:18-CV-1063 (MAD/TWD), 2021 WL 5095292, at *8 (N.D.N.Y. Apr. 21, 2021), *report and recommendation adopted*, 2021 WL 4452094 (N.D.N.Y. Sept. 29, 2021) (citations and footnote omitted); *see also Carrier*, 477 U.S. at 492 ("Attorney error short of ineffective assistance of counsel does not constitute cause for a procedural default.").

*See Murray v. Carrier*, 477 U.S. 478, 496 (1986).  Moreover, Petitioner does not claim he is actually innocent of the crimes for which he has been convicted.  *See generally*, Pet.  Therefore, he is unable to demonstrate that a federal courts' failure to review this claim would result in a "fundamental miscarriage of justice."  *See Sawyer v. Whitley*, 505 U.S. 333, 339 (1992) ("[T]he miscarriage of justice exception is concerned with actual . . . innocence . . . . ").

Regardless of the Appellate Division's denial of this claim on an independent and adequate state law ground, Petitioner's vindictive sentencing claim is meritless.  It is true that "'[a] sentence is unconstitutionally vindictive if it imposes greater punishment because the defendant exercised a constitutional right, such as the right to jury trial or the right to appeal.'"  *Rodrigues v. Kaplan*, No. 9:11-CV-0132 (NAM/RFT), 2014 WL 1875346, at *6 (N.D.N.Y. May 9, 2014) (quoting *Izaguirre v. Lee*, 856 F. Supp.2d 551, 572 (E.D.N.Y. 2012) (citing *Wasman v. United States*, 468 U.S. 559, 567-68 (1984))). However, the fact that the court imposed a greater sentence following conviction than that contained in a rejected plea offer is insufficient to establish vindictiveness in sentencing.  *See Wheeler v. Phillips*, No. 1:05-CV-4399, 2006 WL 2357973, at *10 (E.D.N.Y. Aug. 15, 2006) ("The mere fact that the trial court, following conviction, imposed a higher sentence than the plea offer does not, in and of itself, establish actual vindictiveness."); *see also Edwards v. Artus*, No. 1:06-CV-5995, 2009 WL 742735, at *6 (E.D.N.Y. Mar. 20, 2009) ("[I]n the absence of proof of actual vindictiveness, the Supreme Court has upheld as perfectly constitutional the disparity between a sentence negotiated as part of a plea and one imposed after trial.") (citing *Corbitt v. New Jersey*, 439 U.S. 212, 218-19 (1978)); *Pabon v. Hake*, 763 F. Supp. 1189, 1194-95 (E.D.N.Y.

83

1991); *Lewis v. Graham*, 1:13-CV-0933, 2018 WL 3819557, at *9 (W.D.N.Y. Aug. 10, 2018); *Shu v. Wilmot*, No. 84-CV-5359, 1985 WL 2034, at *4 (S.D.N.Y. July 15, 1985).

In the instant petition, Petitioner avers he was offered "a range of plea agreements" prior to trial "which would have involved either local time or lower prison sentences than that which [Petitioner] received . . . [; County] Court itself had offered [Petitioner] a 2-year sentence . . . [; and t]he facts and circumstances of the case had not changed from the time of the plea negations . . . . " Pet. at 18 (internal quotations omitted). Ultimately, County Court sentenced Petitioner to a determinate term of five years' incarceration and two years of post-release supervision for each of his convictions for assault in the second degree. T. 866-67.

At sentencing,[37] County Court first stated it considered "evaluations from [Petitioner's] mental health providers[;]" Petitioner's "lack of criminal history[;]" and "the range of plea agreements that were offered by the People which included local time and lower prison sentences" when imposing Petitioner's sentence. T. 865. County Court next observed:

> What is clear from the record is that these two women were completely defenseless against [Petitioner's] attack. [The] attack was completely unprovoked by them. They presented themselves as absolutely no threat to [Petitioner's] safety at the time [Petitioner] viciously attacked them and they suffered not only physical injuries but what [County Court] believe[s] will be lifelong emotional injuries, as well.

T. 865-66. Finally, the sentencing court explained it considered "that at the time of the pre-sentence investigation[, Petitioner] continued to deny even that the[] attacks occurred, even after looking [at] and listening to the victims as well as the photographic

---

[37] *See generally*, T. 855-871.

evidence in this case that clearly documented that [Petitioner] did, in fact, attack the women" as well as the fact that the jury "reject[ed Petitioner's] defense of mental disease or defect [by] returning a verdict of guilty."  T. 866.

Petitioner argues County Court's consideration of– "plea offers" Petitioner rejected prior to trial, "the viciousness of the attacks" on the hospital employees, and Petitioner's "denial of committing the offense" during the presentence investigation – "demonstrate[s] that [Petitioner] was indeed being punished for exercising his right to proceed to trial."  Pet. at 19.  Petitioner is incorrect.

The fact that County Court considered plea agreements offered to Petitioner, "which included local time and lower prison sentences" than the sentence actually imposed– T. 865 – in sentencing Petitioner to a term of five-years' incarceration for each assault conviction does not prove that Petitioner was being *punished for exercising his right to proceed to trial*.  Significantly, County Court did not suggest that the sentence it imposed was *based on Petitioner's refusal of the plea offer*.  Rather, County Court stated merely that the terms of prior offers had been "consider[ed]." *See Naranjo v. Filion*, No. 1:02-CV-5449, 2003 WL 1900867, at *10 (S.D.N.Y. Apr. 16, 2003):

> [Petitioner] argues that the disparity between the prosecution's pre-trial plea offer of five to ten years imprisonment and [his] ultimate sentence of twenty-five to fifty years suggests "the presence of retaliation against [Petitioner] for having gone to trial" . . . This disparity does not make out a claim of actual vindictiveness, because the judge never suggested that the sentence was *based on [Petitioner]'s refusal of the plea offer* . . . approaching the maximum legal limit does not, in itself, demonstrate actual vindictiveness. *See, e.g., Corbitt v. New Jersey*, 439 U.S. 212, 219 [] (1978) . . . ; *Chaffin v. Stynchcombe*, 412 U.S. 17, 31 [] (1973) . . . ; *United States ex rel. Williams v. McMann*, 436 F.2d 103, 106-

> 07 (2d Cir. 1970) (finding neither judicial nor prosecutorial vindictiveness where defendant was sentenced to five to ten years after conviction at trial despite a negotiated pre-trial offer of three to seven years in return for pleading guilty to a reduced charge, stating: "This is nothing more than a 'heads-I-win-tails-you-lose' gamble . . . "), *cert. denied*, 402 U.S. 914 [] (1971); . . . *People v. Pena*, 50 N.Y.2d 400, 411 [] (1980) ("From the fact that the court had been willing to accede to the District Attorney's recommendation as to sentence in a plea bargaining context, it does not follow that it was not free, once the defendant was found guilty, to impose a greater, but nevertheless lawful, term of imprisonment."), *cert. denied*, 449 U.S. 1087 [] (1981).

(emphasis added, additional citations omitted).  Put another way, County Court's consideration of the rejected plea offers when determining the appropriate sentence for Petitioner's convictions *may have actually led County Court to impose a lesser term of imprisonment than the seven year maximum set by the state legislature*.[38]  In sum, Petitioner is unable to establish that County Court's imposition of a sentence greater than that contained within prior plea offers was intended to punish Petitioner for declining to accept those offers and, as explained in greater detail below, the mere imposition of a higher sentence after conviction following trial is insufficient to prove vindictiveness.

Turning to County Court's consideration of the "vicious[ness of the] attacks"– T. 865-66 –Petitioner is similarly unable to establish vindictiveness on behalf of the sentencing authority.  Contrary to Petitioner's assertion, County Court's consideration of the nature of the crime based on testimony presented at trial was not improper when fashioning a sentence after conviction.  *See Rivera v. Collado*, No. 1:19-CV-11403, 2021 WL 603047, at *5-14 (S.D.N.Y. Feb. 16, 2021) (rejecting the petitioner's excessive

---

[38] *See* P.L. § 70.02(3)(c).

sentencing claim as "[u]nexhausted, [n]ot [r]eviewable, and [w]ithout [m]erit" where the sentencing court "determined the length of the sentence [imposed] after considering[, *inter alia*,] the injuries sustained by the victim. . . . "); *Edwards*, 2009 WL 742735, at *5-6 n.4 (finding that the "petitioner ha[d] not established a basis for habeas relief" on his excessive and vindictive sentencing claims where "[a]t sentencing, the court remarked that petitioner's crime 'was nothing less than a vicious attack . . . . '"). Rather, the details of the crimes Petitioner was convicted of were a relevant factor properly considered in determining an appropriate sentence within the range proscribed by state law. *See Rodrigues*, 2014 WL 1875346, at *8-9 (finding "no evidence of actual vindictiveness in the record" as the "Petitioner's sentence properly reflected relevant factors which were revealed to the court at or after trial, such as details of the crime, the evidence adduced at trial, Petitioner's defenses, and the characteristics of the Petitioner.").

Finally, the sentencing authority's consideration of Petitioner's "den[ial of the fact] . . . that the[] attacks [even] occurred" at the time of the pre-sentence investigation– T. 865-66 –is also insufficient to establish that County Court imposed Petitioner's sentence as punishment for his decision to exercise his constitutional right to proceed to trial. Courts in this circuit have consistently rejected claims of vindictiveness in sentencing where the sentencing judge considered a defendant's continued denial of responsibility following conviction. *See, e.g., Rodrigues*, 2014 WL 1875346, at *8-9 (denying the petitioner's vindictive sentencing claim where, "the sentencing court judge explained that: . . . [the petitioner] stands before the Court a very cunning, manipulative, arrogant, deviant, violent, dangerous and antisocial personality . . . [and the petitioner] continues

to refuse to accept responsibility for these violent crimes."); *Rivera*, 2021 WL 603047, at *5-14 (rejecting Petitioner's excessive sentencing claim as "[u]nexhausted, [n]ot [r]eviewable, and [w]ithout [m]erit" where the sentencing court "determined the length of the sentence [imposed] after considering[, *inter alia*,] . . . Petitioner's lack of remorse . . . . "); *Rubin v. Garvin*, No. 9:02-CV-0639 (NAM/DEP), 2005 WL 3827593, at *27 (N.D.N.Y. Dec. 15, 2005), *report and recommendation adopted*, 2006 WL 538762 (N.D.N.Y. Mar. 3, 2006), *affirmed*, 544 F.3d 461 (2d Cir. 2008) (concluding, "I am unable to find any indication that the sentences imposed by the trial court were the product of any improper conduct or motivation . . . [where, at sentencing, the court remarked that Petitioner] had 'attempt[ed] to shamelessly escape responsibility . . . . '"). Therefore, County Court's consideration of Petitioner's comments denying the fact that the attacks for which Petitioner had been convicted had even occurred was not improper and does not demonstrate that the imposed sentence was the result of vindictiveness.

The sole evidence Petitioner offers in support of his vindictive sentencing claim is the discrepancy between the sentence contained in a plea bargain offered to him prior to trial and the sentence he actually received.  Pet. at 18-19.  This fact alone is insufficient to demonstrate vindictiveness. *See Pabon*, 763 F. Supp. at 1194-95 (rejecting the petitioner's vindictive sentencing claim where "[t]he only evidence the Petitioner cite[d] in support of his claim of vindictive sentencing was that, after trial, he received a sentence exceeding the promised sentence he rejected as part of the proposed plea agreement."); *Lewis*, 2018 WL 3819557, at *9 (holding "[t]he disparity in the sentences offered and imposed does not make out a claim of actual vindictiveness,

88

because the trial judge never suggested that the sentence was based on Petitioner's refusal of the plea offer" where the petitioner provided no evidence in support of his vindictiveness claim "apart from the discrepancy between the sentence promise offered as part of the plea bargain and the sentence he actually received."); *Shu*, 1985 WL 2034, at *4 (S.D.N.Y. July 15, 1985) (finding "no reason to presume [vindictiveness] solely from the fact of a disparity between a sentence offered as part of a rejected plea bargain and the sentence imposed after trial . . . . " holding that "[s]ome other evidence—for example, suggestive remarks . . . or an exceptionally severe sentence . . . —must be presented to demonstrate the possibility of an improper motive.") (citations omitted).

Petitioner avers that he "had no prior criminal record, apologized to his victims, expressed remorse about his conduct, and according to all evidence . . . was not acting as the law-abiding person he had been throughout his entire life." Pet. at 19. But none of these facts suggest, "a 'reasonable likelihood' . . . [that Petitioner's] sentence [wa]s the product of actual vindictiveness on the part of the sentencing authority[,]" let alone "prove actual vindictiveness." *Alabama v. Smith*, 490 U.S. 794, 799-800, (1989) (first quoting *United States v. Goodwin*, 457 U.S. 368, 373; then citing *Wasman v. United States*, 468 U.S. 559, 569 (1984)). Therefore, the claim that County Court acted vindictively in imposing Petitioner's sentence in violation of the constitution is meritless. Because Petitioner's vindictive sentencing claim is both barred from review and meritless, he is not entitled to habeas relief on this basis.

## V.    CONCLUSION

**WHEREFORE**, it is hereby

**RECOMMENDED**, that the petition, Dkt. No. 1, be **DENIED and DISMISSED** in its entirety; and it is further

**RECOMMENDED**, that no Certificate of Appealability ("COA") shall issue because petitioner has failed to make a substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires; [39] and it is further

**RECOMMENDED**, that any further request for a Certificate of Appealability must be addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and it is further

**ORDERED**, that the Clerk shall serve a copy of this Report-Recommendation and Order upon the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 & 6(a).

Dated: March 8, 2023
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[39] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).